**David SEARLES, Plaintiff,**

**v.**

**FIRST FORTIS LIFE INSURANCE COMPANY, Defendant.**

**No. 99 CIV. 3535 (LAK).**

United States District Court,
S.D. New York.

May 24, 2000.

Evan S. Schwartz, Quadrino & Schwartz, P.C., for Plaintiff.

Randi F. Knepper, Del Mauro, DiGiaimo & Knepper, P.C., New York City, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff David Searles was the owner and chief executive officer ("CEO") of Transource Polymers, Inc. ("Transource"), a distributor of raw plastic materials, until March 1997. Plaintiff claims that he has been unable to work since that time due to severe neck and back injuries. He here sues First Fortis Life Insurance Co. ("Fortis"), Transource's group life and disability insurance carrier, for breach of contract for limiting plaintiff's long term disability benefits to 24 months.[1]

Fortis contends that this action is governed by the Employee Retirement Income Security Act of 1974 ("ERISA")[2] and has moved to dismiss the complaint for failure to state a cause of action or in the alternative, for summary judgment. It seeks also to limit the Court's review of this matter to the administrative record and to strike plaintiff's jury demand. Plaintiff disagrees that ERISA applies to this claim and has cross-moved for an order striking defendant's affirmative defenses based on ERISA, as well as striking defendant's Rule 56.1 statement and the attached affidavits, which plaintiff asserts are not supported by personal knowledge of the affiants.

*Facts*

### The Policy

Plaintiff at all relevant times was insured by a group long term disability policy issued by Fortis. The policy provided disability benefits to each full time employee of Transource for up to 60 percent of the employee's monthly pay, subject to a maximum amount of $10,000 per month, for qualified periods in which the employee was unable to work due to disability.[3] For individuals under age 60 at the time they became disabled, benefits were available until the claimant reached retirement age, as provided by the Social Security Act.[4] In the case of disability due to alcoholism, drug addiction, chemical dependency, and mental illness, however, the benefit period was limited to a combined maximum of 24 months.[5]

### Plaintiff's Disability Claim

As the CEO of Transource, plaintiff oversaw the operation and direction of the company prior to his disability.[6] His duties included meeting with clients and suppliers, negotiating and closing deals, and assisting with the financial management of the company.[7] He has a history of neck injuries dating back to 1967 that allegedly were exacerbated by a 1995 horseback riding accident, following which he underwent a cervical discectomy and fusion on March 3, 1997.[8] According to

---

1. Cpt. ¶¶ 20–22.

2. 29 U.S.C. §§ 1001 *et seq.*

3. Duvall Aff., Ex. F at 0011.

4. *Id.* at 0012.

5. *Id.* at 0020.

6. Gale Searles Aff. ("Searles Aff.") ¶¶ 7, 8.

7. *Id.* ¶ 10.

8. Pl. Mem. in Opposition to Def. Mot. to Dismiss ("Pl.Mem.") 1; Searles Aff. ¶¶ 13–16.

plaintiff, he showed some initial improvement after the surgery, but his condition subsequently deteriorated. The pain in his neck, arms, and legs, and the loss of sensation in his hands and arms that he previously had experienced worsened, and he began taking pain medication to which he became addicted.[9] Additionally, he became severely depressed and began seeing a psychiatrist.[10]

In October 1998, plaintiff submitted a long term disability claim statement to Fortis in which he (or someone on his behalf) indicated that he had been unable to work since March 1997.[11] The attached Attending Physician's Initial Statement of Disability, completed by Dr. Haimovic, indicated that plaintiff had "Persistent Cervical Radiculopathy," could not stand or sit "too long," couldn't walk without "legs locking," and experienced trembling and tingling in his hands, pain in his "low back" and legs, and loss of feeling in his hands and legs.[12] Dr. Haimovic indicated also that plaintiff was unable to work from March 3, 1997 to "present." [13]

Although Fortis denied plaintiff's claim as untimely,[14] it reviewed the claim and found that the evidence did not support a finding of disability in any case. Fortis apprised plaintiff of its determination by letter dated October 26, 1998, and informed plaintiff of the appeals process and the various documents that plaintiff was

required to submit in order to have his claim reconsidered.[15] Plaintiff informed Fortis that he would appeal and, with plaintiff's cooperation, Fortis proceeded to gather medical records, paychecks, and other information relevant to his claim.[16]

Based on the information it received from the medical providers identified by plaintiff, Fortis concluded that plaintiff was entitled to long term disability benefits in the amount of $9,825 per month and that he was physically disabled from March 3, 1997 through June 3, 1997 as a result of his cervical discectomy and fusion, and from December 8, 1997 to December 31, 1997 following surgery for a "fissurectomy, LLQ sphincterotomy." [17] After June 3, 1997, with the exception of 23 days in December of that year, Fortis found plaintiff's disability to be the result of a mental/nervous condition, a class of disability for which the maximum benefit period under the policy was 24 months.[18] This conclusion was based on records received from plaintiff's treating psychiatrist and the review of those records by Patricia Naubauer, Ph.D., a member of Psychiatric Services at Fortis.[19] Plaintiff was notified of Fortis' determination by letter on January 11, 1999,[20] disagreed with the finding,[21] and contested the claim determination.[22]

Also in January 1999, Fortis initiated a peer review of the administrative record by Dr. Heligman, a board certified occupa-

---

9. Pl. Mem. 1; Searles Aff. ¶¶ 17–20.

10. Pl. Mem. 1; Searles Aff. ¶ 20.

11. Wagoner Aff., Ex. B at 0315–0316; Def. 56.1 Statement ("Def. 56.1 St.") ¶¶ 45–47; Pl. 56.1 St. ¶ 27; Searles Aff. ¶¶ 22–23. There is evidence in plaintiff's administrative record that indicates he was able to, and in fact did, work after this date and received compensation for his services. Wagoner Aff. ¶ 45. The Court need not address the issue at this time.

12. Wagoner Aff., Ex. B at 0317.

13. *Id.* at 0318.

14. The policy requires that claims be filed no later than 90 days after the end of the first

month for which benefits were due. Duvall Aff., Ex. F at 0024; Def. 56.1 St. ¶ 51.

15. Pl.Ex. 5; Def. 56.1 St. ¶¶ 51–53.

16. Pl.Ex. 6; Def. 56.1 St. ¶¶ 54–71; Wagoner Aff., Ex. B at 0230–0515.

17. Pl.Ex. 7; Def. 56.1 St. ¶¶ 69,72.

18. Pl.Ex. 7; Def. 56.1 St. ¶ 74.

19. Def. 56.1 St. ¶¶ 74–77; Wagoner Aff. ¶ 41.

20. Pl.Ex. 7.

21. Searles Aff. ¶¶ 29–31.

22. Def. 56.1 St. ¶ 85.

tional medicine specialist, who came to the same conclusion regarding the source of plaintiff's disability and recommended that plaintiff undergo a functional capacity evaluation and independent medical examination in order to better evaluate his physical disability claim.[23] Fortis thereafter requested that plaintiff submit to the evaluations,[24] but plaintiff declined to do so on the grounds that such tests were invasive and dangerous.[25] Plaintiff subsequently filed this diversity case claiming that Fortis has breached the policy and seeking declaratory relief.

## Discussion

### Defendant's Rule 12(b)(6) Motion

Defendant moves to dismiss the complaint for failure to state a claim on the ground that the policy is governed by ERISA and plaintiff's state law claim for breach of contract therefore is preempted.

A Rule 12(b)(6) motion is made solely upon the pleadings.[26] In passing on such a motion, however, the Court considers also those documents to which plaintiff refers in its complaint.[27] In this case, the Court finds that both Transource's application for insurance and the policy are properly considered in the Rule 12 dismissal determi-

nation, as they are incorporated by reference in the complaint.[28]

### Definition of an "Employee Welfare Benefit Plan" Under ERISA

ERISA defines an "employee welfare benefit plan" as "any plan, fund, or program ..: established or maintained by an employer ... for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, ... benefits in the event of sickness, accident, disability, death or unemployment ...."[29]

The first step in determining whether an ERISA-governed plan exists is to decide whether a plan has been established in the first instance.[30] A plan need not be a formal written document,[31] but rather "'is established if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits.'"[32] In this case, it is clear from the policy that the insurance plan provides long term disability benefits in the amount of 60 percent of an employee's monthly pay, up to a maximum of $10,000 per month, for "[e]ach active, full-time employee."[33] The type of policy obtained (noncontributory) indicates that Transource, as the policy-

---

**23.** *Id.* ¶ 82–83.

**24.** *Id.* ¶¶ 85–88; Searles Aff. ¶¶ 31–32.

**25.** Searles Aff. ¶ 32; Quadrino Aff. ¶¶ 3–8; Def. 56.1 St. ¶¶ 92, 94, 96.

**26.** FED. R. CIV. P. 12(b).

**27.** *See International Audiotext Network, Inc. v. AT & T Co.,* 62 F.3d 69, 72 (2d Cir.1995).

**28.** *See, e.g., Aiena v. Olsen,* 69 F.Supp.2d 521, 525 (S.D.N.Y.1999) (citing *Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 140 n. 1 (2d Cir.1999)). More precisely, the policy is incorporated in the complaint and the application is incorporated in the policy. *See* Duvall Aff., Ex. B at 0033.

**29.** 29 U.S.C. § 1002(1).

**30.** Although the Second Circuit "employ[s] a less structured approach" in determining whether a disability insurance program falls

under ERISA than some of its sister circuits, the inquiry nonetheless involves looking to the existence of an employee welfare benefit plan, whether an employer established or maintained it, and whether the safe harbor provision applies to exempt it from coverage. *See Conners v. Connecticut General Life Ins. Co.,* No. 98 Civ. 8522(JSM), 1999 WL 1211831, *1 (S.D.N.Y. Dec.16, 1999); *see also Grimo v. Blue Cross/Blue Shield, of Vermont,* 34 F.3d 148, 151–53 (2d Cir.1994). *Cf. Meredith v. Time Ins. Co.,* 980 F.2d 352, 355 (5th Cir. 1993) (setting forth three-step test).

**31.** *See Aiena,* 69 F.Supp.2d at 532 n. 58.

**32.** *Grimo,* 34 F.3d at 151 (quoting *Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir. 1982)); *see also Aiena,* 69 F.Supp.2d at 532.

**33.** Duvall Aff., Ex. F at 0011.

holder, is responsible for payment of the premiums,[34] and the policy sets forth the procedures for receiving benefits.[35] The Court concludes that a plan exists.[36]

Next, the Court must determine whether the plan was established or maintained by Transource.[37] "A plan is 'established' when there has been some degree of implementation by the employer going beyond a mere intent to confer a benefit." [38] While the purchase of a group insurance policy offers substantial evidence that a plan has been established, it is not conclusive.[39] The determinative information in this case is found in Transource's application for insurance, completed by Transource's chief financial officer, William Blacker.[40] Transource, as the applicant, chose the eligibility requirements for participation in the plan and selected various specialized plan options, including a 90–day qualifying period, the level of coverage and monthly maximum, and the criteria that establish disability.[41] This is sufficient involvement on Transource's part to require a finding that Transource established the plan.[42] Thus, unless the "safe harbor" regulation takes it out of ERISA coverage, ERISA will govern this action.

The Department of Labor has promulgated regulations designed to identify certain practices that do not constitute employee welfare benefit plans. The applicable regulation reads as follows:

"[T]he terms 'employee welfare benefit plan' and 'welfare plan' shall not include a group or group-type insurance program offered by an insurer to employees or member of an employee organization, under which:

"(1) No contributions are made by an employer or employee organization;

"(2) Participation [in] the program is completely voluntary for employees or members;

"(3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and

"(4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs." [43]

In order to be excluded from ERISA coverage, an insurance program must satisfy

**34.** *Id.* at 0001, 0004. The policy is designated as "Noncontributory," which is defined in the policy as meaning that the policyholder pays the premium. Transource is the policyholder. A "Contributory" policy, on the other hand, is one in which the employee pays part of the premium. *Id.*

**35.** *Id.* at 0024–0025.

**36.** Group insurance programs may be "employee welfare benefit plans" under ERISA unless they fall within the safe harbor provisions of 29 C.F.R. § 2510.3–1(j). *See Grimo,* 34 F.3d at 152.

**37.** *See id.* at 151–52.

**38.** *Butero v. Royal Maccabees Life Ins. Co.,* 174 F.3d 1207, 1214 (11th Cir.1999).

**39.** *See Grimo,* 34 F.3d at 151–52 (citing *Donovan,* 688 F.2d at 1373).

**40.** Duvall Aff., Ex. B.

**41.** *Id.* at 1265–67.

**42.** *See, e.g., Royal Maccabees Life Ins.,* 174 F.3d at 1214 (finding that employer established and maintained a plan where it "consulted an insurance agent, selected the terms of the group policy it wished to purchase for its employees, completed an application form for the policy, solicited enrollments from its employees, collected money through payroll deductions, and remitted premium checks" to the insurance company).

**43.** 29 C.F.R. § 2510.3–1(j).

each of the regulation's four criteria.[44]

■ Because the Court is obliged to construe the complaint in the light most favorable to the non-moving party, it must acknowledge the possibility that plaintiff might establish that the plan satisfies the safe harbor criteria. Defendant cannot establish otherwise on the face of the complaint. In consequence, the Court cannot rule as a matter of law that ERISA governs this action. Defendant's Rule 12(b)(6) motion is denied.

Even if plaintiff's claim were preempted by ERISA,[45] the Court simply could treat it as having been brought pursuant to the civil enforcement provision of ERISA,[46] rather than dismissing for failure to state a claim. Apparently recognizing this possibility, defendant has moved, in the alternative, for summary judgment. Because the resolution of plaintiff's motion to strike defendant's Rule 56.1 statement and supporting affidavits is a logical precursor to the summary judgment motion, the Court first addresses plaintiff's motion.

*Plaintiff's Motion to Strike Defendant's Rule 56.1 Statement and Supporting Affidavits*

Plaintiff moves to strike defendant's Rule 56.1 statement on the grounds that it is not a "short and concise statement of material facts" as required by Local Civil Rule 56.1 and that it is "replete with hearsay statements, conclusory allegations, legal arguments and statements not based on personal knowledge."[47] Plaintiff asserts also that, contrary to Rule 56(e), the supporting affidavits of Dianna Duvall and Wendy Wagoner are not based on personal knowledge.

■ A court may "strike portions of an affidavit that are not based upon an affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements."[48] An affiant's conclusions based on personal observations over time, however, may constitute personal knowledge, and an affiant may testify as to the contents of records she reviewed in her official capacity.[49] The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge.[50]

■ Dianna Duvall states in her affidavit that she is a corporate officer for Fortis and is responsible for overseeing its life and disability insurance businesses.[51] She states that in preparing her affidavit she reviewed various administrative materials and files, as well as the Transource policy, and so had direct personal knowledge of the facts and circumstances set forth therein.[52] Ms. Duvall's position with Fortis qualified her to review the relevant business materials in an official capacity and make sworn statements based upon those materials. The Court finds that Ms. Duvall had personal knowledge of the facts about which she testified. Moreover, the

---

**44.** *See Grimo,* 34 F.3d at 152.

**45.** The ERISA preemption provisions are expansive. *See Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987). Except as provided in the saving clause, the ERISA statutes provide that ERISA supersedes "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan ...." 29 U.S.C. § 1144(a). The saving clause excepts from preemption state laws that regulate insurance, but a common law cause of action for tortious breach of contract does not fall within this clause. *See Pilot Life Ins. Co.,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39; *see also Devlin v. Transportation Communications Int'l. Union,* 173 F.3d 94, 101 (2d Cir.1999).

**46.** 29 U.S.C. § 1132(a)(1)(B).

**47.** Pl. Mem. 6.

**48.** *Hollander v. American Cyanamid Co.,* 172 F.3d 192, 198 (2d Cir.), *cert. denied,* —— U.S. ——, 120 S.Ct. 399, 145 L.Ed.2d 311 (1999).

**49.** *See State v. Saint Francis Hospital,* No. 98 Civ. 0939(WCC), 2000 WL 374662, at *2 (S.D.N.Y. Apr.10, 2000).

**50.** *Id.*

**51.** Duvall Aff. ¶ 1.

**52.** *Id.*

statements contained in her affidavit are supported by documentary evidence that she would be competent to introduce at trial.[53] In consequence, her affidavit is admissible.

■ Wendy Wagoner states in her affidavit that she is a benefits specialist for Fortis and is responsible for the investigation and evaluation of claims submitted seeking benefits under its insurance policies.[54] She states that she has personal knowledge of the facts and circumstances set forth in her affidavit because she personally investigated and evaluated plaintiff's claim for disability benefits and thoroughly reviewed the administrative record at issue.[55] Attached to her affidavit is a copy of Transource's long term disability insurance policy as well as plaintiff's administrative record.[56] The Court has reviewed her affidavit and the supporting documents and finds that the statements contained in her affidavit are based either on personal knowledge or information garnered from the review of relevant documents in her official capacity as a benefits specialist. In addition, Ms. Wagoner would be competent to introduce at trial the documents on which she relies.

Finally, the Court notes that Ms. Wagoner's testimony does not contain inadmissible hearsay. Each statement in her affidavit that references conversations with others is supported by citations to the administrative record, in which Ms. Wagoner documented her various conversations in what appears to have been the course of Fortis' regular business practice. Such statements are therefore admissible under the business records exception to the hearsay rule and, as the custodian of the records, Ms. Wagoner is a competent witness through whom they could be admitted at trial.[57] For the above reasons, the Court finds Ms. Wagoner's affidavit admissible in its entirety.

Having found both supporting affidavits admissible, the Court finds no reason to strike defendant's Rule 56.1 statement. The Court acknowledges plaintiff's point that it is 41 pages long, but defendant sets forth the material facts clearly and, perhaps given the fact that the administrative record from which such facts are drawn is more than 450 pages, in the most concise manner possible. Plaintiff's motion to strike defendant's Rule 56.1 statement and the Duvall and Wagoner affidavits is denied.

*Defendant's Motion for Summary Judgment*

To prevail on its motion for summary judgment, defendant must demonstrate that it is entitled to judgment as a matter of law and there is no genuine issue as to any material fact.[58] In so deciding, the Court will rely on all of the motion papers submitted by the parties.

Defendant argues that under either an arbitrary and capricious or a *de novo* standard of review there is no genuine issue of material fact as to whether its claim determination should be upheld.[59] Defendant argues also that summary judgment is appropriate because plaintiff failed to exhaust his administrative remedies.[60] Each

53. See *Saint Francis Hospital,* 2000 WL 374662, at *2.

54. Wagoner Aff. ¶ 1.

55. *Id.*

56. *Id.,* Ex. A, B.

57. *See* FED. R. EVID. 803(6).

58. FED R. CIV. P. 56.

59. Def. Mem. in Support of Summary Judgment ("Def.Mem.") 19–28. Subsumed within

this motion is defendant's request that the Court limit its review of plaintiff's claim determination to the administrative record. *See id.* at 33. The Court will reach this issue if and when it determines that ERISA governs this action and that an arbitrary and capricious or a *de novo* standard of review is appropriate. At this time the request is premature.

60. *Id.* at 29–33.

of these arguments presupposes a finding that ERISA applies to this action.

As stated previously, plaintiff denies that ERISA applies to his disability insurance policy or governs this action, and alleges facts in his papers and supporting affidavits that contradict such a conclusion. Plaintiff argues that Transource served only as an intermediary between Fortis and its employees, received no remuneration for administering the group long term disability policy, that employee participation was voluntary, and that Transource made deductions from the employees' wages representing payment of premiums for their group benefits.[61] If these statements are proven to be true, the policy may fall into the safe harbor created by the Department of Labor and exempt the plan from ERISA coverage.[62]

Defendant disputes plaintiff's assertions and submits documents that contradict plaintiff's affidavits.[63] For example, the application for insurance completed by Transource's chief financial officer indicates that Transource determined which of its employees would be eligible for coverage and the extent of coverage, and was responsible for 100 percent of the premiums.[64] Additionally, the application explicitly stated:

> "ERISA—The coverage applied for provides benefits for the employee welfare benefit plan established and maintained by the employer under the Employee Retirement Income Security Act (ERISA), unless otherwise exempted by

law. The employer is the Plan Administrator unless otherwise noted."[65]

■ ERISA probably applies to this action. Nonetheless, plaintiff has alleged material facts that, if true, could exempt the policy from ERISA coverage and make defendant's arguments as to why it is entitled to summary judgment immaterial.[66] Defendant's motion therefore is denied.

*Plaintiff's Motion to Strike Defendant's ERISA Defenses*

Plaintiff moves pursuant to Rule 12(f) to strike defendant's affirmative defenses premised on ERISA preemption and applicability.[67] Rule 12(f) provides that a court may strike "from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[68] The Court has considered plaintiff's motion and concludes that defendant's defenses do not fall into these categories. It is entirely reasonable, given the facts of this case and the likelihood that ERISA will apply, for defendant to assert defenses premised on its application. Such defenses are in no way redundant, immaterial, impertinent, or scandalous. Plaintiff's motion to strike defendant's affirmative defenses is denied.

*Plaintiff's Jury Demand*

■ Plaintiff has demanded a jury trial. Insofar as plaintiff's claim is not preempted by ERISA, he is entitled to trial by jury on his breach of contract claim.[69] If ERISA applies, however, the action will become a suit to recover benefits under ERISA, which is equitable in nature and

---

**61.** Pl. Mem. 2–3; Blacker Aff. ¶¶ 4–13.

**62.** *See supra* notes 41–42 and accompanying text.

**63.** *See supra* notes 38–39 and accompanying text.

**64.** See Duvall Aff., Ex. B.

**65.** *Id.* at 1265.

**66.** *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("The evidence of the non-movant is to

be believed, and all justifiable inferences are to be drawn in his favor.").

**67.** Pl. Mem. 17 (defenses 1, 5, 8, 9, 10, 11, 12, 13, and 14).

**68.** FED. R. CIV. P. 12(f).

**69.** *See* U.S. CONST. amend. VII; FED.R.CIV.P. 38; *see also Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959).

therefore not appropriate for trial by jury.[70]

Because the parties continue to dispute ERISA's applicability, this action may well proceed to trial before the issue is resolved. In that case, the action will present both legal and equitable issues. In such a situation, the general rule is that the jury must be allowed to decide the legal claims prior to the court's determination of the equitable claims.[71] This serves the strong federal policy of ensuring that the constitutional right to jury trial is preserved whenever possible.[72] Thus, the Court will give plaintiff a full jury trial on all legal issues and, to the extent that the jury's resolution of the factual disputes leads to a conclusion that ERISA applies, the Court then will decide those questions held to be equitable in nature and not triable by a jury. Any jury verdict to that extent will be treated as advisory.

### Conclusion

For the reasons set forth above, all pending motions are denied.

SO ORDERED.

---

**70.** *See Sullivan v. LTV Aerospace and Defense Co.,* 82 F.3d 1251, 1258–59 (2d Cir.1996).

**71.** *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 432 (2d Cir.1995).

**72.** *See Beacon Theatres,* 359 U.S. at 501, 79 S.Ct. 948; *see also Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 470–73, 479, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Lee Pharmaceuticals v. Mishler,* 526 F.2d 1115, 1117 (2d Cir.1975).