**Diane M. BERGQUIST Plaintiff,**

v.

**AETNA U.S. HEALTHCARE and John Does 1–10, Defendants.**

**No. CIV.A.02 CIV.2033CM.**

United States District Court, S.D. New York.

Oct. 28, 2003.

Gary S. Graifman, Kantrowitz, Goldhamer & Graifman, P.C., Chestnut Ridge, NY, for Diane M. Bergquist, plaintiff.

Michael H. Bernstein, Sedgwick, Detert, Moran & Arnold, New York City, for Aetna U.S.Healthcare, John Does 1–10, defendants.

**MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT**

MCMAHON, District Judge.

Diane M. Bergquist ("Bergquist") filed this action against Aetna Life Insurance Co. ("Aetna") (incorrectly sued as AETNA U.S. Healthcare) seeking managed disability benefits under a long-term disability benefit plan established and maintained by Bergquist's former employer, Bell Atlantic Mobile, Inc. ("BAM").

Aetna now moves for summary judgment affirming its decision to deny disability benefits. Bergquist seeks summary judgment that she is entitled to the claimed benefits. For the following reasons, Aetna's motion is granted and Bergquist's motion is denied.

## I.

### BACKGROUND

Diane Bergquist was an employee of BAM and its predecessors from December 1983 to February 1998. On February 5, 1998, she suffered an emotional "breakdown" and did not return to work. She resumed work on a part-time basis from July to November 1998 and then returned full-time from December 1, 1998 to January 21, 1999, at which point she suffered a panic attack at work and never returned.

A. *The Plan*

BAM provides a disability benefit plan ("Plan"), which is insured by Aetna, for its employees. Under the Plan, Aetna is designated "ERISA Claim Fiduciary." (Lundberg Aff., Ex. A, B0000362). While BAM administers the Plan, the disability plan provides that Aetna has discretion to determine eligibility for benefits. Specifically, the Plan provides: "For the purpose of section 503 of Title 1 of [ERISA] . . . Aetna shall have discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of the policy." *Id.*

The Plan comes into effect after a 27–week waiting period. During this waiting period, the disabled beneficiary is covered by short-term disability benefits. Bergquist began collecting short-term disability benefits on February 5, 1998. She became eligible for managed benefits on August 14, 1998.

Under the Plan, "a certified disability will end after 24 monthly benefits are payable if Aetna determines that the disability is, at that time, caused *to any extent* by a mental condition . . . described in the current edition of the DSM." (Lundberg Aff., Ex. A, B0000372) (emphasis added). During the 24–month period, Bergquist's eligibility was recertified monthly. Her treating psychiatrist, Dr. Richard Brand, continually certified her as suffering from Post Traumatic Stress Disorder, which is a mental condition pursuant to the DSM–IV.[1] Drs. Joseph Zacher and David Corwin, at the request of Aetna, performed independent medical examinations on August 26, 1999. They independently diagnosed Bergquist with Post Traumatic Stress Disorder and declared her disabled.

The benefits continued until the end of the 24–month period, August 14, 2000, at which time Bergquist was advised that her benefits were terminated pursuant to the limitations in the policy.

B. *The Appeal*

Bergquist filed a timely appeal on October 3, 2000, asserting that her disability

---

1. DSM–IV (4th ed.) is a diagnostic manual for analysis and description of mental diseases.

was caused by a previously existing but undiagnosed case of Lyme disease. She submitted blood tests, which were facially inconclusive. Regardless, her physician, Dr. Cameron, diagnosed her with Lyme disease. Bergquist's appeal letter requested that her condition be reclassified as medical in nature and that her benefits be reinstated. Aetna never replied to the October 2000 appeal letter.

Bergquist wrote another letter on July 5, 2001, requesting an appeal based on a medical diagnosis of Lyme disease. Aetna responded on July 12, 2001, acknowledging that it had delayed issuing a decision for an unreasonable time. Aetna awarded Bergquist disability benefits retroactively from August 14, 2000 to July 31, 2001, in a show of good faith but without any admission of liability.

In the same July 12 letter, Aetna sustained its decision terminating Bergquist's benefits, finding that no clinical information supported her claim. Aetna also informed her that it would consider a further appeal and asked that she submit any additional information that would be helpful in objectively determining the scope of the disease and any "limitations and restrictions inherent in [your] condition which [your] doctor has placed on [you] as far as gainful activity is concerned". (Lundberg Aff., Ex. B, B0000069–71).

In support of a further appeal, Bergquist submitted additional documentation from Drs. Brand and Cameron describing the Lyme disease and diagnosing her as 100% physically disabled. In particular, Dr. Brand indicated that he now believed that her psychological symptoms were a belated manifestation of chronic Lyme disease. (Lundberg Aff., Ex. B, B0000046). Aetna's medical consultant, Dr. Oyebode Taiwo, examined this evidence, but concluded that it was not sufficient to document her disability. Taiwo noted that Bergquist's doctors "did not document Bergquist's specific signs and symptoms, treatment plan, and restrictions and limitations relating to Lyme disease that prevent her from performing her own occupation as a Supervisor beginning August 1, 2001." (Lundberg Aff., Ex. B, B0000002–4). After receiving Dr. Cameron's narrative report (Bergquist Aff., Ex. E, 00030), he also questioned Bergquist's medical treatment and the results of "extensive testing for other etiologies including evaluations by Neurologist, MRI, and Opthamologist." (Bergquist Aff., Ex. E, 00026) Aetna requested more information from both Dr. Cameron and Bergquist in order to supplement and clarify Dr. Cameron's diagnosis, but it was never received.

Accordingly, Lori Lundberg, a claims analyst for Aetna, informed Bergquist in a letter dated March 18, 2002, that her appeal had been denied. Bergquist had filed this complaint five days prior.

### C. *Other Benefits Proceedings*

Plaintiff, through Allsup, an independent consultant hired by Aetna to obtain Social Security disability benefits for plan participants, did in fact obtain such benefits. SSA issued a decision on January 28, 2002, retroactive to January 1999 in which it concluded that plaintiff had Lyme disease. SSA also noted that plaintiff had exhibited symptoms of depression, anxiety and panic and concluded that these conditions were a "contributing factor" to plaintiff's being unable to work.

## II.

### THE INSTANT MOTIONS AND PRIOR PROCEDURAL RULINGS

As is usually the case, this matter came before the Court on cross motions for summary judgment. Such motions are

ordinarily decided on the administrative record, since the Court is reviewing an administrative determination, either de novo or with deference (see infra., pp. 11–14, infra.). In this case, however, plaintiff contended that the administrative record relied on by Aetna was incomplete, in that it did not include certain documents that she thought should have been obtained and reviewed by Aetna—namely, those documents that had been used by Allsup in processing her claim for disability benefits before the Social Security Administration. Aetna contended that plaintiff had not provided it with the documents collected by Allsup, despite repeated opportunities to supplement the administrative record, and contended that the Court should review the matter based solely on the record assembled by Aetna.

▪ No doubt because Allsup came to plaintiff's assistance through Aetna, plaintiff appears to have been confused about the relationship between the two entities. In her affidavit in support of her motion for summary judgment and opposing Aetna's motion, Bergquist asserted her belief that providing documents to Allsup was the same as providing them to Aetna. She stated that she "thought all medical documents which Aetna and Allsup obtained were exchanged between the two of them." (Bergquist Aff., ¶ 26). In Bergquist's October 3, 2000 letter to Aetna, she wrote, "I note that I have already provided to you though *your agent*, Allsup, Inc., all of the information relating to Dr. Daniel Cameron. Therefore, I believe this information is in your file already." (Emphasis added). She never claimed that Aetna told her that it had access to Allsup's files, nor did she produce any document that could be construed as implying such. Arguably,

any notion that Aetna and Allsup were sharing files should have been dispelled when Aetna began requesting Dr. Cameron's files directly from Bergquist and invited her to submit additional evidence. But her assumption, while apparently in error, was not unreasonable, because Allsup was indeed hired *by Aetna* to help Plan participants obtain Social Security disability benefits.[2] Certainly Aetna did not tell plaintiff in words of one syllable that it was not delving into Allsup's records in order to evaluate her claim.

Concluding that plaintiff had not unreasonably believed that Allsup's files were in Aetna's possession, I directed Aetna to obtain those records and revisit its conclusions. It did so, and on September 15, 2003, it issued a further determination, adhering to its original determination. Aetna's decision noted that it "did not defer to the earlier benefits determinations," and indeed assigned a new individual (Maryanne M. Barry), one previously unfamiliar with the case, to review all the records—both those reviewed by Dr. Taiwo the first time around and the records obtained from Allsup—and to make an entirely new determination. Dr. Amy Hopkins, Aetna's medical director, who was also not involved in the earlier adverse benefits decision, also reviewed the file, and concurred in Ms. Barry's conclusion. Therefore, Dr. Taiwo's determination drops out of the case.

By letter dated September 15, 2003, Ms. Barry notified Bergquist that Aetna had re-reviewed all the material in the records regardless of whether they were new or had been considered previously, but that Bergquist remained ineligible for benefits under the Plan. Barry explained that the termination decision would be upheld be-

**2.** Bergquist also asserted that she told "Aetna to get the records from Allsup." (Bergquist Aff., ¶ 10).

cause "the weight of the medical information provided in connection with your claim did not support that you were totally disabled within the terms of the plan as a result of Lyme Disease."

Specifically, Barry noted that Dr. Cameron had submitted no results from physical examinations, and had proscribed Amoxicillin to treat Lyme Disease over a two month period from July—September 2000 despite negative or inconclusive test results. By early September, Dr. Cameron's notes indicated that Bergquist had reported additional symptoms including crying, irritability, sore muscles and nausea. Bergquist returned to Dr. Cameron in July 2001 again reporting symptoms which included extreme fatigue, depression, headaches, and joint pain. Dr. Cameron treated these symptoms with antibiotics, but Bergquist continued to report having mental confusion, blurred vision and anxiety in July and August 2001. Despite the fact that earlier lab results had been indeterminate, Dr. Cameron's notes listed these symptoms as being Lyme Disease related. Barry noted that Dr. Cameron had not performed any neurophysical evaluations which Barry believe would usually be conducted by a doctor faced with these symptoms. Consequently, there was no way to determine whether the symptoms were the result of Lyme Disease or some other neuropsychological problem. Moreover, Dr. Cameron did not describe any specific limitations or restrictions on Bergquist's activities and did not offer any specific findings to support his conclusion that Bergquist was disabled.

To ensure a complete review, Barry forwarded Bergquist's file to Dr. Amy Hopkins for review. Dr. Hopkins noted that Dr. Cameron had never documented any physical examination and that there was no documentation of any chronic Lyme arthritis, Lyme carditis or neurological Lyme disease. Nor was there any documentation of cerebrospinal fluid evaluation for neurological Lyme disease. Dr. Hopkins also noted that the physical symptoms Bergquist experienced were strongly correlated to her psychosocial stressers and were likely caused by psychiatric problems, and it cannot be presumed that the symptoms were due to Lyme disease "in the absence of stronger evidence to that effect." Consequently, Dr. Hopkins concluded, and Ms. Barry reported to Bergquist, that there was a "lack of evidence in the record of any actual objectively determined findings...which would have supported the presence of any specific physical impairment as of August 14, 2000." (Barry Letter, page 4).

In light of the finding of lack of evidence to support Dr. Cameron's neurophysical diagnosis, Barry explained that Aetna did not give great weight to Dr. Cameron's report. She further noted that, unlike the Social Security Administration which is required to give great deference to the opinion of a treating physician, Aetna was authorized to decide for itself the weight given to any particular piece of evidence. Barry also noted that Social Security had concluded that Bergquist's psychological symptoms were a contributing factor to her being unable to work, and noted, "[w]hile that factor may support an award of SSA benefits, the Bell Atlantic Mobile plan provides that if a disability is caused *to any extent* by a mental condition, benefits are limited to 24 months. As you know, you have already received 24 months of benefits." (Barry Letter, page 5) (emphasis supplied).

Finally, Barry rejected as incredible Social Security's determination that Bergquist, a college graduate, did not have transferable work skills.

Thus, Barry did not find that Bergquist's inability to work after the first

24 months of payments was the result of a physical disability, and upheld the initial determination to terminate benefits.

## III.

## DISCUSSION

### A. *Standard for Summary Judgment*

A motion for summary judgment can be granted when the moving party demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is the non-moving party's burden to "demonstrate to the court the existence of a genuine issue of material fact." *Lendino v. Trans Union Credit Information Co.*, 970 F.2d 1110, 1112 (2d Cir.1992). In opposing summary judgment, a party may not rest upon unsupported allegations or denials, or simply claim without support that evidence advanced by the movant in support of the motion is not credible. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Mycak v. Honeywell, Inc.*, 953 F.2d 798, 801–802 (2d Cir.1992).

### B. *The Arbitrary and Capricious Standard Applies Based Upon Bell Atlantic Mobile's Grant of Discretionary Authority to AETNA*

■ The Supreme Court has held that "a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also Fay v. Oxford Health Plan*, 287 F.3d 96, 103–104 (2d Cir.2002); *Masella v. Blue Cross and Blue Shield of Conn., Inc.*, 936 F.2d 98, 102 (2d Cir.1991). Where the written plan grants discretion to the administrator to determine eligibility, the ultimate decision of the administrator will be viewed with deference unless it is found to be arbitrary and capricious. *See Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir.1995); *Miller v. United Welfare Fund*, 72 F.3d 1066, 1070 (2d Cir.1995); *Seff v. National Org. of Indus. Trade Unions Ins. Trust Fund*, 781 F.Supp. 1037, 1040 (S.D.N.Y. 1992).

### 1. *Authenticity of Disability Benefits Document*

■■ Aetna, as an exhibit to the affidavit of Lori Lundberg, submitted a copy of what it described as the plan document— an Aetna policy form, defining its benefit agreement with BAM. (Lundberg Aff., Ex. A). Plaintiff challenges the authenticity of the Plan because the document does not appear to be self-executing and no proof is offered to show that BAM actually endorsed the Plan. This Court rejects the challenge. Statements from affidavits are admissible where witnesses can show personal knowledge of the material or the statements are based on "information garnered from the review of relevant documents in [their] official capacity as …benefits specialist[s]" *Searles v. First Fortis Life Insurance Co.*, 98 F.Supp.2d 456, 462 (S.D.N.Y.2000). Lori Lundberg states that she is one of Aetna's claim analysts and that she is familiar with the Plan since she works with it on a regular basis. This affirmation is sufficient to conclude that she had personal knowledge sufficient to identify and authenticate the policy as the "Plan."

### 2. *Standard of Review*

■ Once the Plan is authenticated, it is necessary to determine if the purported grant of discretion fits within the frame-

work established by *Firestone*. The language used in the policy appears under the heading "ERISA Claim Fiduciary" and specifically states:

> Aetna shall have discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of the policy. Aetna shall be deemed to have properly exercised such authority unless Aetna abuses its discretion by acting arbitrarily and capriciously.

(Lundberg Aff., Ex. A, B0000362)

While *Firestone* never explicitly stated how specific a grant of discretion is required to be for a plan to qualify for arbitrary and capricious review, the Second Circuit examined a breadth of cases to determine a range of acceptability in *Jordan v. Retirement Committee of Rensselaer Polytechnic Institute*, 46 F.3d 1264 (2d Cir.1995). Of the cases examined, the one most similar to the case at bar is *Jones v. Laborers Health and Welfare Trust Fund*, 906 F.2d 480, 481 (9th Cir. 1990), where "the Ninth Circuit applied an arbitrary and capricious standard of review where the plan at issue gave the trustees the power 'to construe the provisions of this Trust Agreement and the Plan,' and provided that any construction adopted by the Trustees in good faith would be binding." *Jordan*, 46 F.3d at 1270. This Court needs look no further than *Jones* inasmuch as it mirrors Aetna's grant of discretion. Both plans, using nearly identical language, allow the trustees to construe the provisions of the plan and bind where there is no abuse of discretion (i.e. good faith construction of terms).

One of the few cases in which the Second Circuit refused to apply the arbitrary and capricious standard of review was *Masella v. Blue Cross & Blue Shield*, 936 F.2d 98 (2d Cir.1991), which Bergquist contends

should be followed here. *Masella* is distinguishable, however, in the fact that there was no explicit provision granting the administrator the authority to "interpret" or "construe" the plan. *Id.* at 103.

### 3. Conflict of Interest

■ Bergquist alleges that the Court should review the matter *de novo*, regardless of any grant of discretionary authority to Aetna, because Aetna has a conflict of interest between its decision-making obligation and its financial liability. The Second Circuit has held that, even when conducting a deferential review under the arbitrary and capricious standard, the court must be mindful of potential conflicts of interest. In *Sullivan v. LTV Aerospace & Defense Co.*, the court articulated a two-part test to determine whether the administrator's interpretation of the plan is arbitrary and capricious: "First, whether the determination made by the administrator is reasonable, in light of possible competing interpretations of the plan; second, whether the evidence shows that the administrator was in fact influenced by such conflict." 82 F.3d 1251, 1255–56 (2d Cir.1996).

■■ If the court finds that the administrator was in fact influenced by the conflict, the deference traditionally granted will dissolve and the court will interpret the standard *de novo*. *Id.* at 1256. Following the traditional civil burden of proof doctrine, "the burden of proving that the conflict of interest affected the administrator's decision rests with the plaintiffs." *Id.* at 1259. Bergquist has not satisfied this burden. She conjectures that Aetna's dual administrative and fiduciary duties create an inherent conflict of interest, but provides no evidence showing that Aetna was in fact influenced by this purported conflict. She thus fails to satisfy the second prong of the *Sullivan* conflict test.

**410**

*4. De Novo review is not appropriate to compensate for "improper review and procedural irregularities."*

In the supplemental papers filed after the new determination was made, plaintiff argued that de novo review was warranted because of "Aetna's improper review and procedural irregularities." I do not find, however, that Aetna engaged in "improper" review or committed any procedural irregularities.

■ To the extent plaintiff refers to Aetna's failure to consider the Allsup documents in the first place, I do not find any fault with Aetna's conduct. Aetna reasonably relied on plaintiff to submit all the documentation she wanted it to consider, and plaintiff not unreasonably assumed that Aetna already had Allsup's documents in its files. That was a mistake, not an impropriety.

■ The rest of the so-called "irregularities" mentioned in plaintiff's supplemental brief (at p. 8) are not irregularities at all. For example, the failure to issue a review letter until after the commencement of the lawsuit resulted from plaintiff's premature commencement of the action. The alleged untimeliness of the decision on appeal is a function of Aetna's repeated offers to plaintiff that she send additional documents. Plaintiff's claim that certain evidence had to have been ignored goes directly to the validity of Aetna's interpretation of the Plan, and to the weight that Aetna accorded particular pieces of evidence.

The arbitrary and capricious standard of review is applicable to this matter in accordance with the Supreme Court's decision in *Firestone.*

**C.** *AETNA's Denial of Plaintiff's Claim was not Arbitrary and Capricious*

■ "Under the arbitrary and capricious standard, the scope of judicial review is narrow." *Celardo v. GNY Automobile Dealers Health & Welfare Trust,* 318 F.3d 142, 146 (2d Cir.2003); *Peterson v. Cont'l Cas. Co.,* 282 F.3d 112, 117 (2d Cir.2002). The decision of a claim administrator will not be overturned unless it is found to be (1) without reason; (2) unsupported by substantial evidence; or (3) erroneous as a matter of law. *See O'Shea v. First Manhattan Co. Thrift Plan & Trust,* 55 F.3d 109, 112 (2d Cir.1995) (citations omitted); *Pagan,* 52 F.3d at 442. "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] ... requires more than a scintilla but less than a preponderance.'" *Celardo,* 318 F.3d at 146 (quoting *Miller,* 72 F.3d at 1072).

*1. Initial Termination of Benefits*

■ The initial termination of Bergquist's benefits upon expiration of the 24–month disability period was not arbitrary or capricious. Aetna had no indication at the time payment of benefits ended that Bergquist was suffering from anything other than a mental disorder. Her own doctors as well as Aetna's repeatedly certified that she was suffering from Post Traumatic Stress Disorder ("PTSD"). (Lundberg Aff., Ex. B, B0000171, B0000174). Relying on these diagnoses, which were based upon "panic attacks, anxiety, [and] depression" (*Id.* at B0000221), Aetna determined that Bergquist's disability was based on a mental condition. According to the Plan, "a certified period of disability will end after 24 monthly benefits are payable if Aetna determines that the disability is, at that time, caused *to any extent* by a mental condition ... described in the most current edition of the DSM." (Lundberg Aff., Ex. A, B0000372) (emphasis added). Since

PTSD appears in the DSM as a recognized mental condition, Aetna did not act arbitrarily or capriciously in terminating Bergquist's benefits.

### 2. Plaintiff's Subsequent Appeal

██ Aetna granted Bergquist the right to appeal its termination of her benefits, and it is Aetna's appellate decision (ultimately made on September 15, 2003) to which she takes exception. The Court must limit its examination of evidence to the administrative record when reviewing administrative decisions under the arbitrary and capricious standard. *Miller*, 72 F.3d at 1071. Likewise, consideration in this case is limited to the information available to Aetna when making its decision.

### (a) Aetna's Administrative Record

██ Much of the information in the original administrative record used by Aetna to decide Bergquist's appeal was in the form of computerized records and call logs. Aetna allegedly lost or misplaced original copies of independent medical examinations done by Aetna's doctors, Zacher and Corwin, during a reorganization of its offices. The conclusions were memorialized, however, in computerized form during the normal course of business. Bergquist challenges the admissibility of that computerized data.

A specific exception to the hearsay rule is made to allow exactly this type of evidence. Under Fed.R.Evid. 803(6) any

> memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation,

all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness

will not be excluded by the hearsay rule. Therefore, the computerized memorialization of these documents will be accepted as part of the administrative record.

The Allsup records are also part of the administrative record for the purposes of assessing Dr. Barry's review of plaintiff's file.

██ After Aetna submitted its decision on remand to the Court, plaintiff obtained yet another affidavit from Dr. Cameron, one that purported to respond to and criticize the administrative decision. Plaintiff's submission of this document was entirely improper. Dr. Cameron's October 9, 2003 affidavit was NOT part of the administrative record, either originally or on remand—it could not have been, since it was executed after the administrative decision was made—and it is not appropriate for the Court to consider evidence outside the record material. I am not considering it.

### (b) The decision was not arbitrary or capricious based on the totality of the record and the terms of the Plan as interpreted by Aetna.

██ Bergquist alleges that her request for continuing long-term disability benefits pursuant to the Plan is based on her complete inability to work due to Lyme disease. She submitted evidence during the administrative appeal to try to demonstrate that she has Lyme disease. (Lundberg Aff., Ex. D). Specifically, she submitted blood tests conducted using the Western blot and Eliza methods. The tests were inconclusive; comments on the test result forms stated that they "[did] not meet the positive CDC criteria [and

were] considered indeterminate by the [New York State Department of Health]."

Although the blood tests were inconclusive, Dr. Cameron diagnosed Bergquist with Lyme disease based on clinical symptoms and a rash common with Lyme disease. He began treating her for the disease in July 2000—about the time her PTSD disability benefits ran out. (Lundberg Aff., Ex. B, B0000054). Bergquist's other doctor, Dr. Brand, while agreeing that her condition was most likely based on Lyme disease, conceded that her "condition presents, in part, as a 'psychological' problem . . . ." [3] (*Id.* at B0000046).

This Court may not substitute its own judgement for that of Aetna's where Aetna is granted discretionary authority unless its decision is arbitrary and capricious. Here, the Plan provides that, where a mental condition contributes to plaintiff's disability *to any extent*, benefits are limited to 24 months. Since plaintiff received 24 months of benefits because she was medically certified as having certain mental disorders—and only revised her claim to encompass Lyme disease when those benefits ran out—I am hard-pressed to see how Aetna acted arbitrarily and capriciously in concluding that her condition was caused at least in part by her mental health issues, or in giving less weight to Dr. Cameron's review than to Dr. Brand's original conclusion that both Lyme and mental health issues were probably involved. The discrepancies between the diagnoses of Drs. Cameron and Brand, coupled with multiple years of Bergquist's being certified as suffering from PTSD, and the fact that the record lacked the sort of supporting data (in particular, neuropsychological testing) that would have ruled

out PTSD as a partial or total cause of plaintiff's symptoms, gave Aetna ample justification to conclude that her condition was caused, *at least in part,* by a mental condition. In short, the record contains substantial evidence tending to show that plaintiff's disability was caused, at least in part, by a mental condition, which disentitles her to benefits beyond the 24 months already paid out to her. "Where both the [administrator] and a spurned claimant 'offer rational, though conflicting, interpretations of plan provisions, the [administrator's] interpretation must be allowed to control.' " *Pulvers v. First UNUM Life Ins. Co.,* 210 F.3d 89, 92–93 (2d Cir.2000).

Aetna, as claim administrator, used the discretion granted by the Plan and evaluated the facts. By determining that plaintiff's mental condition, at the very least contributed to her condition, Aetna appears to have followed the letter of the policy in denying her further disability benefits. It cannot be said to have acted in an arbitrary and capricious manner.

■ Bergquist contends that Aetna determined her benefits in an arbitrary and capricious manner because it refused to consider a report from the Social Security Administration that deemed her disabled and qualified her for Social Security disability. However, in *Pagan v. Nynex Pension Plan,* 846 F.Supp. 19, 20 (S.D.N.Y. 1994), *aff'd,* 52 F.3d 438 (2d Cir.1995), the District Court held that determinations of the Social Security Administration are non-binding and are not dispositive on the findings of the independent insurance provider.[4] The provider is given discretionary authority and may review facts before it in its own manner.

---

**3.** As noted above, Brand changed his diagnosis in 2001, after plaintiff's initial benefits—which were certified based on his diagnosis of psychological illness—ran out.

**4.** The Second Circuit upheld the District Court's grant of summary judgment, but did not specifically address the Social Security Administration's ruling.

As defendant points out, SSA is bound by its own rules and regulations to give substantial weight to the opinion of the treating physician, who in this case was Dr. Cameron. But Aetna, as administrator of a private Plan, is not bound by such a restriction, and is permitted to give such weight as it deems appropriate—or no weight at all—to the opinion of a treating physician, as long as that opinion is considered. Given the totality of the evidence in the record, I cannot conclude that Aetna acted arbitrarily and capriciously in rejecting Bergquist's claim. Even SSA concluded that plaintiff's documented mental problems "contributed to" her disability—which, under the express terms of the Plan, disentitled her to benefits after 24 months.[5]

Because I rule on this ground, I need not reach defendant's alternative argument that plaintiff was not entitled to benefits because the record does not indicate that Bergquist was unable to work at "any reasonable occupation," as required by the Plan. (Lundberg Aff., Ex. A, B0000370).

### D. *AETNA is Not Liable for Failing to Provide Documents*

▉ In the second count of plaintiff's complaint, she seeks relief under 29 U.S.C. § 1132(c)(1). That provision provides that a court may impose a fine (up to $100 per day) upon a plan administrator who fails to provide information to a participant or beneficiary as required by ERISA. However, "[l]iability under [§ 1132(c) ] is clearly limited to plan 'administrators.'" *Pineiro v. Pension Ben. Guar. Corp.*, No. 96 Civ. 7392, 1997 WL 739581, at *14 (S.D.N.Y. Nov. 26, 1997).

The statute defines an "administrator" as:

(i) the person specifically so designated by the terms of the instrument under which the plan is operated; (ii) if an administrator is not so designated, the plan sponsor; or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation proscribe.

29 U.S.C. § 1002(16)(A).

▉ Here, the Plan designates Aetna as the "ERISA Claim Fiduciary," not as an "administrator." (Lundberg Aff., Ex. A, B0000362). Indeed, the Plan fails to designate any "administrator." Thus, pursuant to Section 1002(16)(A)(ii), the "plan sponsor" is the administrator. In this case, the "plan sponsor"—which ERISA defines as "the employer in the case of an employee benefit plan established or maintained by a single employer," 29 U.S.C. § 1002(16)(B)(i)—is BAM. As a result, BAM is the plan administrator and only BAM (not Aetna) can be subject to statutory penalties under 29 U.S.C. § 1332(c).

Relying on *Law v. Ernst & Young*, 956 F.2d 364 (1st Cir.1992), Plaintiff urges that Aetna should be liable as an administrator because it "held itself out as the administrator" and "voluntarily [took] over the disclosure function." (Pl. Mem. of Law in Opp., 21–22). However, this court is bound by the decisions of the Second Circuit which has expressly disagreed with those cases in the First and Eleventh Circuits holding employers responsible as *de facto* administrators under ERISA §§ 502(a)(1)(A) and 502(c), 29 U.S.C. §§ 1132(a)(1)(A), 1132(c). *Lee v. Burkhart*, 991 F.2d 1004, 1010 n. 5 (2d Cir. 1993). *See also, Crocco v. Xerox Corp.*, 137 F.3d 105, 107 (2d Cir.1998); *Ross v. Rail Car America Group Disability Income Plan*, 285 F.3d 735, 743–44 (8th Cir.

---

**5.** I note that Aetna specifically addressed the SSA determination in its most recent ruling.

2002); *VanderKlok v. Provident Life and Accident Insurance Co., Inc.*, 956 F.2d 610, 618 (6th Cir.1992); *Moran v. Aetna Life Insurance Co.*, 872 F.2d 296 (9th Cir. 1989); *Davis v. Liberty Mutual Insurance Co.*, 871 F.2d 1134, 1138 (D.C.Cir.1989).

In certain respects, this formalistic approach defies common sense: Aetna possessed most of the information requested by Bergquist, and it was not unreasonable for plaintiff to believe that she had to retrieve the information from Aetna. Yet, the Second Circuit has warned: "An obligation is placed on the person designated under ERISA as the 'administrator' of the plan, not on every fiduciary." *Lee*, 991 F.2d at 1010. And "[r]espect for our proper role requires that we decline . . . to substitute our notions of fairness for the duties which Congress has specifically articulated by imposing liability on the 'administrator.'" *Id.* at 1010 n. 5 (quoting *Davis*, 871 F.2d at 1138, n. 5) (internal quotations omitted).

### E. *Aetna is Not Liable for Attorney's Fee*

Because Bergquist did not prevail in her motion, the Court declines to award attorney's fees.

### F. *Aetna May Amend Its Pleading*

Ordinarily, dismissal of a plaintiff's claims would end a lawsuit like this one. However, on August 23, 2002, Aetna moved to supplement or amend its answer to add a counterclaim seeking the restitution of certain payments made to Bergquist during her disability period. The disputed amount of $50,625 represents an alleged overpayment of benefits to Bergquist pursuant to the terms of the Managed Disability Plan.

The total amount of overpayment is determined by calculating the amount of "other income" received by a beneficiary during the disability period. Specifically, under the section entitled "Benefits Actually Payable," the Plan states "any weekly or monthly benefit actually payable will be reduced by 'other income benefits.'" (Lundberg Aff., Ex. A, B0000365). "Other income benefits" is defined to include benefits received under the Federal Social Security Act. (Lundberg Aff., Ex. A, B0000374). Additionally, "other income benefits include those, due to your disability or retirement, which are payable to: you; your spouse; your children; your dependents." *Id.*

Bergquist and her children began receiving benefits from the Social Security Administration on January 25, 2002, and payments were awarded retroactively to July 1999. Aetna claims that these benefits fall within the definition of "other income" and should offset its liability under the Plan.

Aetna moves to supplement its pleading pursuant to Federal Rule of Civil Procedure 13(e), which provides: "A claim which either matured or was acquired by the pleader after serving a pleading may, with the permission of the court, be presented as a counterclaim by supplemental pleading." Under Rule 13(e), leave is not proper if claims were ripe prior to the filing of the answer. Furthermore, "Rule 13 must be read in conjunction with Rule 15 of the Federal Rules of Civil Procedure." *Gasser Chair Co., Inc. v. Infanti Chair Mfg. Corp.*, No. 88 Civ. 3931, 1991 WL 10931, at *1 (E.D.N.Y. Jan. 24, 1991); *Tommy Hilfiger Licensing, Inc. v. Bradlees, Inc.*, 99 Civ. 4677, 2001 WL 1702151 (S.D.N.Y. Jan. 11, 2002). Rule 15(d), which specifically deals with supplemental pleadings, only permits a "party to serve a supplemental pleading setting forth *transactions or occurrences or events which have happened since the date* of the plead-

ing sought to be supplemented." Fed. R.Civ.P. 15(d) (emphasis added).

█ Bergquist received notification of a favorable decision from the Social Security Administration in late January 2002 and Aetna was notified of this decision on February 5, 2002. Although Aetna asserts that it discovered the claim on or about May 2, 2002, the actual "transaction or occurrence or event" that gave rise to the claim accrued more than two months prior to the filing of the answer when Aetna was notified. Therefore, leave to supplement is not proper under Fed.R.Civ.P. 13(e).

█ However, Aetna does have alternative means to amend the pleading. Fed. R.Civ.P. 13(f) provides: "[w]hen a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, the pleader may by leave of court set up the counterclaim by amendment." Read in the light of Rule 15(a), which requires that leave to amend "be freely given when justice so requires," this Court finds that Aetna should be granted leave to amend.

While I find that Aetna's claim matured prior to April 22, 2002, when Aetna filed its answer, no contradictory evidence is set forth to show bad faith or undue delay that would prevent the grant of leave to amend. The Supreme Court has stated, in part, that "... in the absence of any apparent or declared reason ... such as undue delay ... the leave sought should be freely given." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). In *Nolan v. City of Yonkers,* the court permitted an amendment two years after the answer had been filed where that claim would have otherwise been barred. No. 92 Civ. 6067, 1996 WL 120685 at *5 (S.D.N.Y. Mar. 19, 1996). Similarly, in *Travelers Insurance Co. v. Buffalo Reinsurance Co.,* the court granted leave to amend after fourteen months where it found no evi-

dence of bad faith. No. 86 Civ. 3369, 1990 WL 116741 at *2 (S.D.N.Y. Aug. 7, 1990). It is clearly within this Court's discretion to grant Aetna leave to amend after only a few months.

Furthermore, under the doctrine of claim preclusion, Aetna would be barred from raising the claim at a subsequent point because it revolves around the same transaction or occurrence currently before the Court. "The doctrine of *res judicata,* or claim preclusion, generally prevents the litigation of any claim or ground of recovery that was available to a party in a prior action, whether or not the prior judgment actually determined that claim or ground." *Prime Management Co., Inc. v. Steinegger,* 904 F.2d 811, 815 (2d Cir.1990). Since Aetna would be barred from raising the claim for restitution in any future action against Bergquist, this Court sees no reason, absent bad faith or unreasonable delay, to deny Aetna's motion.

## IV.

## CONCLUSION

Aetna's motion for summary judgment is granted. Bergquist's cross-motion for summary judgment is denied. Aetna's motion to amend its pleading to add a counterclaim is granted.

So ordered.