Beverly **ZAKRE**, Plaintiff,

v.

**NORDDEUTSCHE LANDESBANK GIROZENTRALE,** Defendant.

No. 03 Civ.0257 RWS.

United States District Court, S.D. New York.

Nov. 2, 2005.

Vladeck, Waldman, Elias & Engelhard, P.C. by Anne L. Clark, Karen Cacace, New York City, for Plaintiff.

McDermott Will & Emery LLP, by Joel E. Cohen, New York City, for Defendant.

## OPINION

SWEET, District Judge.

Defendant Norddeutsche Landesbank Girozentrale ("Nord/LB", the "Bank" or the "Defendant") has moved under Rule 56, Fed.R.Civ.P., to dismiss the complaint of plaintiff Beverly Zakre ("Zakre" or the "Plaintiff") alleging that Nord/LB discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, the New York State Human Rights Law, Executive Law § 296 *et seq.*, and the Administrative Code of the City of New York § 8–107 *et seq.*, and to strike certain allegations from the affidavits of Zakre, Sylvia Bier ("Bier"), Heidi Brown ("Brown"), Andrea Rudzwick ("Rudzwick"), Aimee Srebrik ("Srebrik"),

Maria Spinelli ("Spinelli"), and paragraphs of Plaintiff's Response to Defendants' Statement of Undisputed Facts. For the reasons set forth below, the motions to dismiss the complaint and to strike are denied.

### Prior Proceedings

Zakre filed her complaint on January 13, 2003, alleging that the Bank discriminated against her because of her gender and retaliated against her because of her opposition to unlawful employment actions in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17; the New York State Human Rights Law, New York Executive Law §§ 296–301, and the Administrative Code of the City of New York §§ 8–107–8–109, asserting that Zakre was better qualified for the position of treasurer than the man who was appointed, that there was a pattern of discrimination against women, that decisionmakers made discriminatory comments, and that the Bank has allowed the man it hired to abuse and demote Plaintiff because of her gender and because of her complaints of discrimination.

Discovery proceeded, and the instant motions were heard and marked fully submitted on March 16, 2005.

### The Facts

The facts are set forth in the Defendant's Statement in Compliance with Rule 56.1 ("Def.56.1"), the Plaintiff's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Pl.56.1"), and Defendant's Reply to Plaintiff's Statement of Purported Material Facts ("Def. R. 56.1"). The facts are not in material dispute except as noted below.

Nord/LB is a German bank incorporated as a public law institution in the State of Lower Saxony, one of the states of the Federal Republic of Germany, engaging in a wide range of commercial banking activities with branch offices in Germany and in the world's leading financial centers, including New York, Singapore and London. Nord/LB's headquarters are located in Hannover, Germany (the "Head Office").

According to Nord/LB, it provides equal employment opportunities to all of its employees in accordance with applicable federal, state, and local laws and maintains an equal employment opportunity policy that expressly prohibits discrimination based on, among other things, sex, race, color, religion, age, national origin and disability, a policy which is monitored and enforced by its human resources department.

Zakre began her employment at Nord/LB on or about February 15, 1991 as a vice president and the treasurer of the New York office. She had previously been employed by BfG Bank, which was acquired by Nord/LB in 1991. While working at BfG Bank from 1982 to 1991, Zakre was a trader in its treasury department. Prior to working at BfG Bank, Zakre was a trader in the treasury department of the Canadian Imperial Bank of Commerce from 1976 to 1982.

As treasurer at Nord/LB, Zakre was responsible for, among other things: (i) the maintenance and growth of Nord/LB's treasury activities; and (ii) the development of new business as it related to treasury activities. As treasurer, Zakre reported directly to Jens Westrick ("Westrick"), the executive vice president and general manager of the New York office. Zakre was hired as treasurer before Nord/LB hired Westrick as general manager of the New York branch.

As treasurer at Nord/LB, according to Zakre, she was in charge of all trading activities, which primarily included money markets and foreign exchange, and, as Nord/LB was new to the United States market, she was in charge of creating and developing the treasury department.

Zakre maintains that she introduced Nord/LB to many new customers, which is denied by the Bank.

According to Zakre, during her time as treasurer she attempted to institute new products, such as futures, floating rate agreements, and swaps, but the Bank's systems were not prepared to handle these products, and the Head Office was slow to grant approval of these products. Zakre contends that she was also restricted in her ability to introduce new products by the capital constraints placed on Nord/LB's New York office by the Head Office. These contentions are denied by Nord/LB which maintains that Zakre lacked the ability to develop new customers and permits.

Rudzwick, assistant vice president and head of money markets for Nord/LB, reported to Zakre when she was treasurer and thought that Zakre did a very good job as treasurer. Liesenfeld, Nord/LB's controller, also thought that Zakre's performance as treasurer at Nord/LB was good.

In 1991, she was ranked "exceeds job requirements" in three performance evaluations, including "leadership qualities." In 1993, the summary portion of her performance evaluation stated that she "performed commendably" and was never ranked below "meets job requirements" in any category on any performance evaluation from 1991 through 1993.

Whether the performance appraisals of Zakre for 1991, 1992 and 1993 pointed out significant inadequacies in managing the treasury department is in dispute. Although Nord/LB maintains that Zakre lacked the ability, on her own initiative, to develop new customers and products for the treasury department and to increase the profitability of the treasury department by introducing new products, according to Zakre the performance appraisal stated that she "is committed to her work, is interested in expanding it and develops many fruitful initiatives." According to Zakre, Nord/LB's systems had to be updated before they could handle the new products that she suggested, and her ability to introduce new products was "frustrated by a lack of EDP-support as well as by slow responses from Head Office regarding new trading proposals and Head Office imposed limitations on Grundsatz and bank credit limits."

Whether Zakre asked Westrick for approval to introduce new products into the department is in dispute.

Beginning in 1994, according to Nord/LB, its Head Office sought to increase the profitability of the New York treasury department and because of Zakre's performance it demoted Zakre from treasurer and on June 3, 1994 hired Sean Bovenizer ("Bovenizer") as the treasurer of the New York office. Zakre consulted a lawyer concerning a claim of gender discrimination but did not pursue a claim because she thought such a claim would jeopardize her job. Her reasons for not pursuing a claim are disputed.

Zakre was the most senior woman in Nord/LB's New York office. Zakre thought that she was capable of maintaining the position of treasurer and that Westrick was uncomfortable with her managing an area because she was a woman. Others also noticed that Westrick did not treat Zakre in the same way he treated men and that he was uncomfortable dealing with women. Zakre did not tell anyone at Nord/LB that her demotion was due to her gender. Nord/LB has challenged Zakre's testimony for lack of specificity.

Brown, a human resources manager for Nord/LB at the time, thought that Zakre did a very good job as treasurer and was shocked when Zakre was demoted and Bo-

venizer was hired as the treasurer. It appeared to Brown that Westrick decided to hire Bovenizer and demote Zakre because he preferred dealing with a man. Nord/LB has challenged Brown's allegations as conclusory and without personal knowledge.

Bovenizer was previously employed as the treasurer of a large financial institution and managed its treasury department for six years, and Nord/LB believed he had the expertise and experience required for the growth of the treasury department. According to Nord/LB, shortly after Bovenizer commenced employment at the Bank, he took the lead in developing the Capital Markets practice in the New York office, and Bovenizer also reached the Bank's goals of implementing new products and expanding the treasury department. Whether Bovenizer or Zakre developed the Bank's Capital Markets practice is in dispute.

Nord/LB did not change Zakre's title as vice president, and placed Zakre in the role as the head of the Capital Markets area, a sub-group within the treasury department, nor did it decrease her salary. Zakre was given freedom to run the Capital Markets practice, although she thought she had been replaced because she was a woman. Zakre reported directly to Bovenizer who, until December 1996, reported directly to Westrick. Zakre's performance during the time she reported to Bovenizer is in dispute.

After December 1996, at the direction of the Head Office, oversight of the treasury activities of all of the Bank's international offices shifted from each branch office to the head of the Bank's treasury department located in the Head Office, although Westrick continued to be involved in the management of the treasury department.

Bovenizer began to report directly to Jurgen Kosters ("Kosters") in the Head Office. Kosters is a member of the Bank's board of management (the German equivalent of a board of directors in the United States), none of whom are women, and is responsible for the Bank's treasury departments throughout the world. The supervisory board of Nord/LB consists of thirty-three people, five to 10 of the members of which are women. Kosters reports to the Bank's supervisory board.

From 1994 through 2000, Zakre was in charge of the capital markets group. Her responsibilities included establishing Nord/LB's securities portfolio, which grew from being nonexistent to having assets of over five billion dollars. According to Zakre, she implemented new products, such as collateralized debt obligations, asset backed securities, mortgage backed securities, and municipal bonds, which implementation is denied by the Bank. While Zakre was in charge of capital markets, the group also introduced credit derivatives to Nord/LB. In addition, Zakre maintained an extensive network of senior level contacts in the investment banking community. According to Nord/LB, her performance appraisals noted her need to develop product knowledge.

Whether Zakre failed to increase her product knowledge and to implement new products in the treasury department is in dispute.

Spinelli worked for Nord/LB's New York branch as an assistant vice president and senior portfolio manager from September 1998 until June 2003. Throughout her time at Nord/LB, Spinelli reported to Zakre. Prior to working at Nord/LB, Spinelli had fourteen years of banking experience.

According to Spinelli, because Bovenizer did not have much experience in areas covered by capital markets, he gave Zakre a great deal of freedom to run the depart-

ment. Spinelli thought that overall Bovenizer was a good treasurer, but that Zakre was more knowledgeable in capital markets and structured products than he was. Spinelli's allegations are denied by Nord/LB as being conclusory and without personal knowledge.

According to Zakre, Bovenizer told Zakre that she was doing a very good job. According to Nord/LB, the consistency of her statement is in dispute.

Bier also recognized that Zakre was successful as head of capital markets, respected by her counterparts, and given control of the treasury department in Bovenizer's absence. Bier's allegations are disputed by Nord/LB as conclusory and without personal knowledge.

During the years that Zakre received performance evaluations between 1994 and 2000, she was ranked "met job requirements" in 28 categories and "exceeded job requirements" in 14 categories.

Beginning in 1998, the profits of the Capital Market Group started to decline, but in her 1998 performance evaluation, Zakre was rated "exceeded job requirements" in three categories. In 1996, comments on Zakre's performance included, "This officer has had an exceptional year." In her 1997 performance evaluation, Zakre was rated "exceeded job requirement" in four categories. In addition, this performance evaluation stated that Zakre "has done a first rate job and achieved objectives."

In 2000, Zakre, in response to a performance review by Bovenizer with which she was dissatisfied, stated, "I am disappointed that the review implies that I've done a mediocre job when in fact I've been instrumental in making this a banner year for the Treasury and the Branch as a whole," and expressed her frustration that she had made such a significant sum for

Nord/LB in 1999, but had not received bonus compensation that reflected the profitability of the Capital Markets group.

In a separate memorandum, also responding to her performance review, she wrote that: "It seems obvious to me that my perception of my performance differs substantially from that of the Bank," and that "I feel my performance, as evidenced by our substantial improvement in profitability, was not fairly represented, and request that you reconsider and adjust my compensation to reflect my performance." Zakre met with both human resources and Kosters after she sent this memorandum, but her compensation was not adjusted. Zakre has submitted evidence that according to Birgit Elchoueri ("Elchoueri") that Westrick had control over compensations for employees in the treasury department in New York.

Zakre did not complain that her performance evaluation or bonus compensation for 1999 were based on her sex.

In November 2000, Bovenizer announced that he was retiring from Nord/LB early the following year and, according to the Bank, he told Kosters that the Bank should hire an external candidate to replace him and that Zakre, whom he had supervised for almost seven years, was not his first choice for his replacement. According to Zakre, Bovenizer told her that he had advised Kosters that Zakre was capable of taking over his position. Kosters instructed Westrick to contact an executive search firm in New York to assist the Bank in its search for a new treasurer.

Zakre became acting treasurer after Bovenizer retired. Her responsibilities, whether complete or administrative, are in dispute.

Rudzwick, who reported to Zakre when she was performing these responsibilities

thought Zakre did a very good job as acting treasurer and assumed that Zakre would succeed Bovenizer as treasurer since Zakre was fully qualified for the position. In addition, Spinelli thought Zakre was fully qualified to assume the treasurer position on a permanent basis. Nord/LB has challenged these allegations as conclusory and without personal knowledge.

Kosters directed Westrick to screen the candidates presented by the executive search firm and to propose three individuals to be interviewed by Kosters in Hannover. Although Kosters works and lives in Germany, according to Nord/LB, he is cognizant that in the United States it is illegal to base hiring decisions on an individuals gender or to retaliate against an individual for making a complaint of discrimination. Kosters' familiarity with discrimination and retaliation laws is in dispute.

Kosters told Westrick that he was looking for an individual who could elevate the treasury department to new levels. His motivation is denied by Zakre.

In March 2001, Westrick contacted Danelle Dann International, Inc. ("Danelle Dann"), an executive search firm the Bank had retained in connection with hiring male and female employees. According to Westrick, he informed Danelle Dann that the bank was looking for an individual with: (i) significant experience in charge of managing treasury activities; (ii) extensive market knowledge of treasury products and investment banking activities; (iii) knowledge of the products in the Bank's treasury department; and (iv) a professional demeanor, good presence and strong communication skills. His testimony as an interested witness is challenged by Zakre.

In May 2001, Zakre traveled to Germany to attend a strategy meeting. During her time in Germany, she met with Kosters and told him that she was qualified to be treasurer and wanted to be considered for the permanent treasurer position. According to Zakre, Kosters responded that she would be considered with outside candidates, a statement denied by Nord/LB.

From 1996 to 2001, Zakre occasionally reported to Kosters on the state of the Capital Markets group and delivered presentations to him. She also reported directly to him from March through September 2001.

According to Nord/LB, based on his personal interactions over an extended time with Zakre and his knowledge of the performance of the Capital Markets group, Kosters concluded that she was merely an average employee and lacked the communication skills necessary for a high level representative of the Bank, and, in essence, she was neither sufficiently dynamic nor innovative, conclusions denied by Zakre as those of an interested witness.

Zakre testified that she knew of no statements made by Kosters related to gender in connection with his hiring of Gajano, and she has denied that Kosters was solely responsible for the hiring.

According to Nord/LB, Kosters informed Zakre that the Bank wanted to hire an external candidate and, if they were not able to do so for price limitations or other reasons, only then would the Bank consider internal applicants. Zakre has denied this version of the conversation.

In May 2001, Zakre also told Liesenfeld that she wanted to be considered for the treasurer position. According to Zakre, Liesenfeld told Westrick that Zakre wanted to be considered for the treasurer position, a contention denied by Nord/LB.

Thereafter, in the spring of 2001, Danelle Dann provided Westrick with the resumes of approximately fifteen individuals for the Bank's consideration, only one

of whom was a woman. After reviewing the resumes, Westrick interviewed approximately ten individuals whom he felt possessed the necessary qualifications, not including the female candidate. Thereafter, Westrick selected three individuals for Kosters to consider, Alessandro Gajano ("Gajano"), Howard Freeman ("Freeman"), and Daniel Koval ("Koval").

Westrick has contended that he chose these candidates for Kosters' consideration because each candidate: (i) had previously been a manager in charge of a treasury department of a bank; (ii) was familiar with a broad range of financial products; (iii) had access to a broad range of clients, such as investment banks and insurance companies; and (iv) presented himself in a professional manner with the kind of presence and communication skills that Kosters was looking for in a treasurer. This contention is denied by Zakre.

Kosters requested that Westrick provide him with a list of candidates to be considered for the treasurer position. Westrick did so, and did not include Zakre or any internal candidates on the list. The only candidates included on Westrick's list were those supplied by Danelle Dann. Westrick did not ask Danelle Dann why only one candidate was a woman, nor did he request that the pool of applicants be diverse in terms of gender or race. Nord/LB has challenged this characterization of Westrick's testimony.

According to Zakre, Prior to recommending candidates for treasurer in 2001, Westrick had said words to the effect, "We have too many women officers in the Bank," a statement denied by the Bank. At the time that Westrick made that statement, according to Zakre, there were only a few women officers at Nord/LB, and there were no women officers running a department. Westrick is alleged to have commented to a female employee of the

Bank, "Oh, you women think differently than men," and also made a comment about another female employee after she left Nord/LB, asking if the woman worked at Nord/LB to do work or to find a boyfriend. These statements are challenged by Nord/LB as conclusory and irrelevant.

In addition, according to Zakre, Westrick avoided speaking with women, and always spoke to a man whenever possible, did not accept opinions of senior women, and strictly asked opinions of senior men, allegations denied by Nord/LB.

Allegations that Westrick also excluded women from management meetings and avoided taking women on business calls are denied by Nord/LB which noted that Zakre did not provide an instance of Westrick's inability to work with her. Allegations that Westrick was particularly hostile to women who were assertive are denied by Nord/LB as conclusory and lacking personal knowledge.

According to Westrick, he informed Kosters that Freeman was his first choice for the position. This is denied by Zakre based upon a statement alleged to have been made by Westrick.

According to Nord/LB, Westrick presented the candidates to Kosters and was not involved in the decision to hire the treasurer, which was made entirely by Kosters. Based upon a statement alleged to have been made by Kosters, Zakre has denied that the choice was made by Kosters.

According to Nord/LB, Kosters believed that each of the proposed candidates had the requisite experience and background for the treasurer position and decided that Gajano was the best candidate for the position. According to Zakre, Westrick made the decision.

According to Elchoueri, Brown, and Spinelli, Westrick generally resisted promot-

ing women and would not approve promotions to women at the highest levels of management, allegations which the Bank denies, pointing out that during the time Westrick was the general manager of the New York branch he had promoted four women to assistant vice president, three women to vice president, five women to assistant treasurer, and one woman to risk controller. The bank also points out that one of Westrick's direct reports was a woman and notes that Elchoueri was promoted by Westrick. Further, Nord/LB denied Elchoueri, Brown, and Spinelli's allegations as lacking personal knowledge.

According to Elchoueri, when Westrick was informed that Zakre wanted to be considered for the treasurer position, he "smirked" and said, "Well, we all know that that is out of the question," allegations which Nord/LB has denied and considers conclusory.

When Westrick provided his recommendations of candidates for treasurer to Kosters, he included information that is illegal to consider, such as the candidates' national origin, age, and marital status, which, according to Kosters, he did not consider. It was obvious from the names of each candidate that they were all men.

In 2001, Srebnik was a foreign exchange dealer for Nord/LB. Srebnik had previously worked with Gajano at Banco di Napoli. When Srebnik learned that Gajano was being considered for the treasurer position at Nord/LB, she met with Westrick and explained to him that Gajano had been verbally abusive to her when she worked for him at Napoli and that Gajano had treated her differently from the male employees. Srebnik told Westrick that she was concerned that if Gajano was hired at Nord/LB he would subject Srebnik to verbal harassment and differential treatment.

Srebnik also told Liesenfeld that Gajano had discriminated against her on the basis of her sex at Banco di Napoli. According to Zakre, Srebnik's allegations were relevant to Nord/LB's decision to hire Gajano. Nord/LB has characterized Liesenfeld's testimony differently to the effect that nothing could be done about Gajano's conflict at another institution.

Westrick did not discuss Srebnik's concerns with anyone else at Nord/LB before including Gajano as one of his three recommendations to Kosters.

Kosters and Westrick decided that Srebnik's allegations that Gajano had discriminated against her based on her sex at Banco di Napoli were "not important for [their] decision [to hire Gajano] and not important for the working together between Ms. Srebnik and Gajano" and that events at another institution did not warrant a decision not to hire Gajano.

Elchoueri, who worked in Nord/LB's human resources department, believed that Westrick preferred Gajano because he thought Gajano would drive women out of Nord/LB. When she shared her belief with Andrea Hollandt ("Hollandt"), human resources manager for Nord/LB, and with Liesenfeld, neither disagreed with her. Nord/LB has denied these allegations and has characterized them as surmise and conjecture.

According to Elchoueri, after learning about Srebnik's allegations that Gajano had discriminated against her at Napoli, Westrick said he thought Gajano was the best choice for treasurer. This allegation has been denied by Nord/LB which maintains that after meeting with Srebnik, Westrick recommended Freeman to Kosters as treasurer.

Westrick included Gajano as one of his three recommendations to Kosters, and excluded Zakre from consideration, even

though according to Zakre she was more qualified for the treasurer position than Gajano. According to Spinelli and Rudzwick, Zakre had experience with a broader spectrum of financial products, more trading experience, and had more management experience than Gajano. Nord/LB has denied these allegations and characterized them as conclusory and without personal knowledge.

After Srebnik learned that Gajano had been hired by Nord/LB, she hand-delivered a memorandum to Westrick reiterating her concerns about Gajano. Srebnik also sent a copy of her memorandum to Kosters. Kosters was aware of Srebnik's complaint about Gajano prior to the time Nord/LB hired Gajano. According to Nord/LB, Kosters, however, thought Srebnik's allegations that Gajano had discriminated against her based on her sex at Napoli were "not really serious."

Despite being put on notice that Gajano had discriminated against Srebnik on the basis of her sex at Napoli, Nord/LB hired Gajano. Gajano had been employed in the banking industry for more than twenty years. Prior to joining Nord/LB, Gajano worked in the treasury department of Banco di Napoli's New York office for more than ten years, first as a trader and then as the treasurer for six years.

According to Spinelli, Kosters later told her that the decision to hire Gajano had been made by Westrick. These allegations have been denied by Nord/LB which has maintained that the decision was made by Kosters.

Kosters testified that he found Gajano to be dynamic, success-oriented, and full of initiative, and that he believed that as treasurer Gajano could successfully represent the Bank to its clients, testimony which is that of an interested witness and inconsistent, according to Zakre.

Gajano commenced his employment with Nord/LB on or about September 17, 2001. Shortly thereafter Gajano evaluated the various procedures established by Bovenizer and initiated certain changes in the treasury department. He required that the managers of the treasury department's sub-groups produce weekly status reports and a report after every trade and also demanded that all sub-group heads continuously keep him informed of developments and issues.

In addition, upon commencing employment with Nord/LB, and in order for Gajano to effectively manage the department, it was necessary for Gajano to familiarize himself with the treasury department's guidelines, processes, and procedures. According to Zakre, he was not familiar with the products in which Nord/LB invested. In this regard, Gajano asked all employees in the treasury department to provide him with certain information, such as the Bank's proprietary investment guidelines and procedures.

According to Nord/LB, while serving as treasurer of Banco di Napoli, Gajano restructured the treasury department and implemented new products, and had extensive knowledge of numerous financial products, a claim which is denied by Zakre who has maintained that her experience and knowledge are superior to Gajano's.

After Gajano was hired, Zakre asked Kosters why Gajano was chosen to be treasurer and she was not. According to Zakre, Kosters originally said it was because Gajano had more trading experience and when Zakre told Kosters that this was not true, Kosters said it was because Gajano had more client contacts than Zakre. Nord/LB has denied that Kosters made the statements and that trading experience was relevant.

According to Zakre, after Gajano was hired, he told her that he had no intention

of trading. Gajano told Rudzwick to take his name off a trading report because he was not going to be trading. Nord/LB has denied this statement.

According to Nord/LB, Zakre repeatedly failed to provide Gajano with the information he requested. According to Zakre, she provided what was requested except for guidelines which had not been agreed to. Also, upon his arrival at the Bank, Gajano terminated a male employee in the treasury department who had, according to Zakre, lost substantial sums for the Bank.

Gajano has not terminated a female employee of the treasury department since his arrival at Nord/LB. According to Zakre, all women working for Gajano, except Zakre, have left the bank, some of whom have stated that they left because of Gajano's treatment of women.

According to Zakre, several women other than Zakre believed that they were denied job opportunities, promotions, or career advancement at Nord/LB because of their sex, and many women resigned from Nord/LB because of these reasons and because Nord/LB allowed Gajano to retaliate against Plaintiff for complaining about discrimination. These allegations have been denied by Nord/LB and characterized as surmise and conjecture.

In September 2001, after Srebnik gave Westrick her memorandum concerning Gajano, she met with Liesenfeld. Liesenfeld asked her if she was resigning, and she said that she was not. Srebnik told Liesenfeld that she was concerned that Gajano would discriminate against her at Nord/LB, especially because she was pregnant. After Gajano started working at Nord/LB, Srebnik met with Westrick and Hollandt. Westrick told Srebnik that he had informed Gajano of her concerns and that he wanted her to discuss the situation directly with Gajano.

On September 20, 2001, Srebnik met with Gajano, Hollandt and Zakre regarding her concerns about Gajano. According to Srebnik, Gajano was very hostile toward Srebnik during the meeting, a characterization denied by Nord/LB.

According to Rudzwick, Gajano had previously told Hollandt that Srebnik would not be returning from maternity leave, claiming that that is what Rudzwick told him. She also contends that when she told Gajano that Srebnik would be returning from maternity leave, Gajano told Rudzwick that Nord/LB was eliminating Srebnik's position and that if Rudzwick wanted to keep Srebnik she would have to find something for Srebnik to do. Nord/LB has denied this statement and characterized it as surmise and conjecture.

According to Srebnik, in October 2001, Hollandt told Srebnik that Gajano had told her that Srebnik would not be returning from maternity leave. In this same general time, Bob Nolin ("Nolin") and Rosa Morngallo ("Morngallo"), Banco di Napoli employees, told Srebnik that Gajano had said to them that Srebnik would not be returning from maternity leave. Nord/LB has denied this statement.

In November 2001, Gajano called Srebnik into his office. He told her that he was "disappointed" with the letter she had written about him before he started, and tried to discuss the issues raised in her letter. According to Srebnik, she refused because his tone was hostile and he was making her very uncomfortable. Nord/LB has denied this characterization of the conversation.

In late November 2001, Srebnik came across an e-mail message from Gajano to Wilifred Bock, the global head of foreign exchange trading for Nord/LB, that Gajano had apparently discarded. The e-mail was dated November 27, 2001, and had the

heading "Rate–Re: FX Orders." FX is the shorthand used within the industry for foreign exchange. In the e-mail Gajano referred to the "lackluster results" achieved by the "current competencies" in the department. At the time, Srebnik was the only FX trader. Gajano also wrote that, "If and when the Bank wants to make a commitment in the FX markets in N.Y. I will make sure that the right competence is found and recruited to achieve preset objectives. . . ." All of Srebnik's performance reviews at Nord/LB had been excellent.

Srebnik began maternity leave on January 4, 2002 and gave birth on January 28, 2002. Prior to returning to Nord/LB from leave, Rudzwick told Srebnik that Nord/LB had decided to eliminate foreign exchange trading. According to Srebnik, she had kept in contact with the person handling the foreign exchange trades during her maternity leave and knew that there was no decrease in activity during her leave. Nord/LB had denied the allegations concerning the level of trading.

According to Rudzwick, she told Srebnik that Gajano had said that he did not have a place for Srebnik within Nord/LB, that if Rudzwick wanted Srebnik back, she had to find something for Srebnik, and that Gajano appeared surprised when Rudzwick was able to put together a proposed position. These statements have been denied by Nord/LB.

During her maternity leave, on April 5, 2002, Srebnik sent a memorandum to Westrick, with a copy to Liesenfeld, stating her concerns regarding Gajano, and informed them that Gajano had made comments to other bank employees that she would not be returning to work after maternity leave. According to Rudzwick, Gajano claimed that Rudzwick said Srebnik was not returning after leave, although Rudzwick specifically told Gajano that Srebnik would be returning. Srebnik's memorandum also stated that Gajano questioned her competence as a trader, and that Gajano was involved in the decision to eliminate all of the foreign exchange trading in the New York branch, which essentially eliminated her job duties. Nord/LB has denied the statement attributed to Gajano.

According to Srebnik, she was presented with three options for a position upon her return from leave. Because she had no other choice, she accepted one of the options, which was a position as a corporate trader. According to her, she asked for a title such as vice president or assistant vice president, which would be necessary to obtain the meetings required of the corporate trader; Gajano refused. Nord/LB has denied that she asked for the title and has noted upon her return there was no change in her salary, benefits, or title.

Srebnik returned from maternity leave on April 15, 2002. During her first week in the office, Gajano ignored her until Friday. According to Srebnik, on or about April 17, 2002, she met with Liesenfeld regarding her April 5, 2002 memorandum, who offered no solution and suggested that she have another meeting with Westrick. Srebnik contends that Nord/LB did nothing to address the concerns she raised. Nord/LB has denied that she made a complaint after her return.

According to Srebnik, she resigned from Nord/LB because it was not possible for her to succeed in her new position and because Nord/LB management ignored her repeated pleas that they address her concerns about discrimination. Nord/LB has denied this reason for her resignation which it contends is contradicted by her deposition.

According to Srebnik, after she left Nord/LB, Gajano had all of the resumes of

the individuals who had applied to fill the position sent to his home, so that no one else could see who had applied. According to Rudzwick, Gajano told Rudzwick that he would not hire a woman for the position. Nord/LB has characterized her allegations as surmise and conjecture.

According to Srebnik, Gajano hired Nolin to replace her as corporate trader at Nord/LB and he was given the title of corporate trader, assistant vice president, a title Srebnik had requested but Gajano had refused to give to her. Srebnik also contends that Nolin was also given a higher salary than Srebnik had received. Nord/LB denies that Nolin was given a higher salary and has stated that Srebnik's title was assistant treasurer.

According to Srebnik, she retained attorneys and filed a charge alleging that Nord/LB discriminated against her on the basis of her sex with the Equal Employment Opportunity Commission ("EEOC") and decided not to pursue litigation after the EEOC dismissed her case without conducting an investigation. Nord/LB denies the reason for the dismissal, stating that the EEOC conducted an investigation and was unable to conclude that discrimination had been established.

Rudzwick worked for Nord/LB in the New York branch from 1990 through December 2002. She was promoted to vice president in Nord/LB's treasury department in February 2000.

According to Rudzwick, while she was a trader, Nord/LB hired a man as foreign exchange trade and Westrick commented, "Now we will see what real trading is." Nord/LB has denied this statement and characterized the statement as surmise and conjecture.

Rudzwick had received a Masters Degree in finance. According to Rudzwick, the man hired as a foreign exchange trader did not have any graduate degree and was less qualified than Rudzwick, but was paid more than Rudzwick. Nord/LB has denied that he was less qualified and paid more and has characterized her statement as having been made without personal knowledge.

According to Rudzwick, initially she was assertive at Nord/LB, causing her difficulty in dealing with Westrick, and she received low raises and bonuses. She contends that once she began to act less assertive and more submissive, Westrick ignored her but increased her raises and bonuses. Nord/LB has denied that allegation stating that it is based on surmise and conjecture.

According to Rudzwick, on one occasion, Westrick was standing right behind her and discussing how beautiful he thought a female analyst was. Nord/LB has denied the allegation as based on surmise and conjecture.

Rudzwick resigned from Nord/LB on December 15, 2002. According to Rudzwick, she resigned because on many occasions she had complained about Gajano's behavior to Liesenfeld and Hollandt, Nord/LB had not taken any action, and she decided that she could not continue to work at Nord/LB if Nord/LB was going to continue to allow Gajano to retaliate against Zakre. The Bank has denied the reason for the resignation and her complaints and has stated that she received an offer from another financial institution.

According to Rudzwick, after she resigned Gajano told her that Kosters had ordered Gajano to be nice to her, and that Nord/LB was using Rudzwick as a pawn against Zakre. Nord/LB has denied the allegations and characterized them as surmise and conjecture.

According to Rudzwick, her bonus had increased after Nord/LB received the let-

ter from Zakre's counsel stating that Zakre had a claim for sex discrimination. The Bank has denied the allegation as conclusory.

According to Spinelli, when she was hired at Nord/LB she requested the title of vice president, and although Bovenizer was in favor of giving her the title, Westrick told her that she could not be hired as a vice president because there were current employees who were awaiting promotion to that title who would be upset if she was given it upon hiring. According to her, she agreed to begin employment as an assistant vice president but said that she wanted to be promoted to vice president in a year, and Westrick agreed. Nord/LB has denied that Westrick had any responsibility in her promotion.

According to Spinelli, she was never promoted to vice president and Bovenizer told her on several occasions that he supported her promotion, but that Westrick would not approve it. Nord/LB has denied the statements attributed to Bovenizer and Westrick's responsibility and has noted Zakre's comments on Spinelli's tardiness.

According to Spinelli, when Gajano was hired, he also refused to promote her, claiming that he did not know enough about her. Nord/LB has denied this allegation, stating that the decision not to promote was made by Kosters.

According to Spinelli, Gajano, however, hired Schmidt as a vice president in treasury in March 2002, even though Gajano did not know anything about Schmidt and Schmidt was unfamiliar with several of the products used by Nord/LB's treasury department. Nord/LB has denied her allegations, stating that she lacks personal knowledge.

According to Spinelli, she noticed that Gajano treated women with less respect than he treated men and was particularly hostile and abusive to Spinelli and Zakre and often belittled Spinelli and Zakre in front of Schmidt and other employees. Nord/LB has denied her allegation, stating a lack of personal knowledge.

According to Spinelli, she complained to Liesenfeld about Gajano's abusive conduct, but Liesenfeld did not take any action. Nord/LB has denied that she complained of discrimination and stated that she complained that Gajano required too much administrative work. Gajano made it difficult for Spinelli to perform her job by giving her conflicting instructions. Spinelli complained to Kosters about Nord/LB's refusal to promote her, and her belief that she had not been promoted because she was a woman, that Gajano was making it difficult for capital markets to perform well, and that Gajano was creating a hostile environment.

Kosters told Spinelli that he was aware that there were problems with Gajano and Zakre and Srebnik. Kosters told Spinelli that he and Westrick had determined that Gajano would stay at Nord/LB. Kosters also told Spinelli that he and Westrick were "not happy" that she had complained about Gajano to Liesenfeld.

Even though Spinelli was a senior portfolio manager, Gajano refused to let her sell portions of certain portfolios and required her to do work more appropriate for a junior credit analyst.

According to Spinelli, she considered pursuing a claim of sex discrimination against Nord/LB because of Nord/LB's refusal to promote her and because of Gajano's treatment of her, but ultimately decided not to pursue a claim, and instead resigned. Nord/LB has alleged that when she resigned she stated that her opportunities were limited because Zakre was her supervisor.

Elchoueri worked for the New York branch of Nord/LB from October 1998 until October 2001 as Liesenfeld's deputy and started at Nord/LB with the title of an analyst. According to Elchoueri, although she had a college degree, her salary was the same as a male clerk who did not even have a high school diploma. Nord/LB has denied the allegations concerning the clerks' qualifications and salary and has characterized them as surmise and conjecture.

Although Elchoueri was Liesenfeld's second-in-command, she was not allowed to fill in for him at management meetings with Westrick. According to Elchoueri, instead, John Kane ("Kane"), an accounting manager, would fill in for Liesenfeld, even though Kane's functions and experience did not make him an appropriate choice. Nord/LB has denied the allegation concerning his qualifications and experience and characterized it as surmise and conjecture.

According to Elchoueri, the management meetings with Westrick were essentially a "boys' club," with women almost never allowed to attend. Nord/LB has denied the allegation and characterized it as surmise and conjecture.

According to Elchoueri, she was promoted to assistant treasurer in 2001, and Liesenfeld recommended that her salary be increased from $3,750 per month to $5,000 per month. This was approved by Nord/LB's head office, but Westrick reduced Elchoueri's raise by $500 per month. Nord/LB has denied the allegation of the reduction by Westrick and characterized it as not based on personal knowledge.

According to Elchoueri, after she received the raise, Liesenfeld told her to thank Westrick and she refused because Westrick had reduced her raise. When Westrick found out about this, he told Liesenfeld that Liesenfeld would never be promoted to senior vice president because Liesenfeld "couldn't control that woman." Nord/LB has denied this allegation and characterized it as surmise and conjecture.

According to Elchoueri, when she resigned in October 2001, she told Liesenfeld, "We both know that women don't make it here. We both know why I'm leaving" and Liesenfeld replied, "I hate to see you go, but it is best that you do." Nord/LB has denied this allegation and characterized it as surmise and conjecture.

Elchoueri currently works at Landesbank Baden–Wurttemberg ("LBBW") with three other women who worked at Nord/LB. Although none of them were able to advance their careers at Nord/LB, at LBBW they have all achieved the title of vice president, and two have become department heads. Nord/LB has denied knowledge about the allegation and characterized it as irrelevant.

Sylvia Bier ("Bier") worked for the New York branch of Nord/LB as a human resources manager from 1997 through September 2000, reporting to Liesenfeld.

According to Bier, she found Westrick very difficult to deal with, and it appeared to her that he did not have high regard for the women in the office. Nord/LB has denied this allegation and characterized it as surmise and conjecture.

According to Bier, other women complained to Bier about Westrick's treatment of them and Bier told Liesenfeld about these concerns, but Liesenfeld disregarded these complaints. Nord/LB has denied the allegation and characterized it as surmise and conjecture.

According to Bier, in or about the spring of 1999, Bier was hospitalized for an ectopic pregnancy; prior to this time, no one at Nord/LB had told her of any problems with her job performance. She contends

that after she returned from her hospital stay, Liesenfeld and Westrick were aware that she had been pregnant, her relationship with both of them deteriorated, and they became critical of her performance. Nord/LB has denied these allegations and stated that it has no knowledge as to her actions and impressions.

According to Bier, in January 2000, she informed Liesenfeld and Westrick that she was pregnant again. Her relationship with both of them became significantly worse after that. Nord/LB has denied these allegations and stated it has no knowledge as to her actions and impressions.

According to Bier, she began maternity leave in June 2000; she planned to take twelve weeks off, as she was guaranteed this amount of leave by the Family and Medical Leave Act and told Liesenfeld that she planned to take twelve weeks of leave. Nord/LB has admitted the maternity leave but stated it has no knowledge of her actions or impressions.

According to Bier, after she had been on maternity leave approximately eight weeks recuperating from a C–Section, Liesenfeld called her and told her that Nord/LB wanted her to come back to work right away, and that if she did not she would lose her job; Bier told Liesenfeld that she understood that she was entitled to twelve weeks of maternity leave and that she had intended to take twelve weeks off. According to her, Liesenfeld reiterated that if she did not return to work by Monday, Nord/LB would fire her. Nord/LB has denied these allegations and stated that it has no knowledge as to her actions and impressions.

According to Bier, because of Nord/LB's demand, Bier returned to work in August 2000, approximately eight or nine weeks after she began maternity leave. While admitting the return, Nord/LB has denied these allegations and stated it has no knowledge as to her actions and impressions.

According to Bier, Westrick did not support the human resources department of Nord/LB and at one point Bier offered to facilitate an anti-discrimination and anti-harassment program, but was told that Nord/LB managers and employees did not need that type of training. Whether or not managers at Nord/LB received any training in equal employment opportunity policies or in anti-harassment policies, and whether or not human resources employees at Nord/LB received training in equal employment opportunity policies or in anti-harassment policies is disputed.

In September 2000, Bier resigned from Nord/LB because of the way it had handled her maternity leave. Nord/LB has denied these allegations and stated it has no knowledge as to her actions and impressions.

Brown worked for Nord/LB as a human resources manager from March 1994 until July 1997 and she reported directly to Liesenfeld and indirectly to Westrick.

According to Brown, prior to working at Nord/LB, she had experience in accounting but not in human resources. It appeared to Brown that Westrick was not interested in hiring anyone with a human resources background because he did not think that Nord/LB needed a full-time employee dedicated to human resources issues. Nord/LB has denied knowledge as to her experience and characterized her allegation as surmise and conjecture.

According to Brown, she found Westrick to be dismissive of the women in the New York branch and it appeared to her that Westrick did not value her opinion because she was a woman. Nord/LB has denied her allegation and characterized her allegation as surmise and conjecture.

According to Brown, at some point in 1994, Liesenfeld was leaving for a business trip and Brown put out her hand to shake hands with him to say goodbye. Instead of taking Brown's hand, Liesenfeld tried to hug and kiss her. Brown pulled away, clearly upset by Liesenfeld actions. Nord/LB has denied any knowledge as to her allegation.

According to Brown, when Liesenfeld returned from his business trip, his working relationship with her changed; prior to this time they had had an agreeable working relationship and he had not told Brown of any problems with her performance, but after this incident, Liesenfeld was very critical of Brown's performance and verbally abusive toward her. Nord/LB has denied any knowledge as to her allegation.

According to Brown, she did not complain to anyone at Nord/LB about Liesenfeld's behavior because there was no one else in human resources other than the two of them, and because she did not believe Westrick would care about how Liesenfeld was treating her. Nord/LB has characterized her allegation as surmise and conjecture.

According to Brown, during her time at Nord/LB, she discussed a promotion to assistant vice president with both Westrick and Liesenfeld, and both of them rejected her request and treated it as a joke. Nord/LB has denied knowledge as to her allegations.

According to Brown, she noticed that other women were rarely promoted above the assistant vice president level at Nord/LB and recalled that in addition to herself, Claudia Rothe, Diana Matlosz and Andrea Johan performed well, had been with Nord/LB for many years, and requested promotions, but Westrick refused to promote them. Nord/LB has denied the allegations and has stated that Brown lacked personal knowledge of the performance of the women to whom she referred.

From October 1998 through October 2001, Elchoueri observed Nord/LB's payroll information as part of her job. According to Elchoueri, during that time in the departments over which Westrick had control, including treasury, men were paid more than women who performed the same or similar jobs; Westrick had authority to change salaries and bonuses of all employees in Nord/LB's New York office except for those in the structured finance group. According to Westrick, after 1996 oversight over the treasury departments shifted to the Head Office and he had no supervisory authority and in the structured finance group, there were no disparities in pay between men and women who performed the same or similar jobs.

Bier also observed that men in Nord/LB's New York office were paid more than women with the same or similar jobs.

Rudzwick was also paid less than a male trader who was less qualified than she was.

Westrick was reluctant to hire employees with extensive human resources experience, and employees in Nord/LB's human resources department often had very little training in human resources.

Hollandt, a human resources manager for the Bank, did not know if retaliation was prohibited by Nord/LB's equal employment opportunity policy. According to Zakre, Hollandt's deposition indicates that she was also unaware of whether it was improper to consider a prospective employee's age, marital status, or national origin when making a hiring decision. Nord/LB denies this characterization of the deposition.

According to Spinelli, Rudzwick, and Zakre, after Gajano received the treasurer position, he treated Zakre and other wom-

en in the treasury department worse than he treated the men. According to Nord/LB, Gajano's conduct as a manager was consistent with all employees.

According to Nord/LB, Zakre displayed performance problems upon Gajano's arrival, a fact denied by Zakre, who has challenged the Bank's characterization of nine mortgage backed transactions. Zakre has denied the admissibility of documents, which according to the Bank establish that she missed deadlines. According to Nord/LB, Gajano sought to replace Zakre because of her performance as the head of Capital Markets and interviewed Kenneth Schmidt ("Schmidt") for the position. Zakre has denied any failure of performance.

According to Nord/LB, Gajano informed Kosters, Westrick, and Dr. Dunkel, who is the head of corporate banking in the Head Office, of Zakre's performance issues within weeks after his commencement of employment with the Bank in the fall of 2001. According to Zakre, his testimony only related to the time he received information and is that of an interested witness.

According to Nord/LB, on January 3, 2002, Gajano sent Zakre two memorandums which set forth in detail various performance problems. Zakre disputes the characterization of the memorandums.

On January 7, 2002, Nord/LB received a letter from Zakre's attorney (the "January 7, 2002 Letter") alleging that the Bank discriminated against Zakre by not promoting her to treasurer. Zakre maintains that she first consulted with counsel on October 24, 2001 concerning the alleged discrimination. On March 7, 2002, Nord/LB's counsel responded, indicating that Zakre was not promoted to the treasurer position because Nord/LB felt that Gajano was better qualified for the position. Counsel for the Bank indicated that while Nord/LB had no present intention of ter-

minating Zakre, despite her performance in the fall of 2001, her performance was expected to improve if she was to remain employed. Zakre contends that this letter was the first notice of any performance issues.

In light of the January 7, 2002 Letter, Gajano decided to retain Zakre as the head of capital Markets and create a new position for Schmidt, who according to Zakre was less qualified. According to Nord/LB, Zakre acknowledged at her deposition a number of different performance problems that occurred or were unearthed since Gajano started working as treasurer, a characterization of her testimony Zakre denies.

In 2002, the Head Office stripped the New York branch of its authority to invest in certain financial products, for which products Zakre was responsible. The reason for the action is disputed. Zakre also has disputed that she failed to recognize information critical to the features of an investment bond, resulting in a monetary loss to the Bank.

Zakre testified by deposition concerning memoranda sent by Gajano relating to the January 7, 2002 Letter. The characterization of that testimony is in dispute.

In March 2002, two months after the January 7, 2002 Letter, Zakre received a bonus in the amount of $50,000, the highest bonus she ever received for her work as treasurer in 2001. Zakre has continued to receive salary increases and bonuses under Gajano's supervision and testified that she never complained that the salary increases she received under Gajano's supervision were unfair. Liesenfeld (who is the head of risk management), Spinelli, and Carl Platt (former employees of the treasury department) all complained to Westrick about Gajano's micro-management and excessive scrutiny, and Spinelli has complained about failure to promote

and the appointment of men in senior positions.

Gajano testified that he is demanding with all of his employees. Zakre has claimed that he treated her worse than male employees. Schmidt, who sits next to Zakre in the trading room at the Bank, testified that Gajano is a demanding supervisor.. His testimony as to the treatment of Zakre is disputed.

Zakre testified that Gajano was more aggressive and abrasive than Bovenizer and that Gajano is a hands-on manager with everyone, interrupts all employees with questions all of the time, berates other employees, and places unreasonable time demands on other employees. Zakre told her psychologist that Gajano treats people in an aggressive manner.

Prior to receiving Nord/LB's counsel's letter, Zakre had never been rated below "met job expectations" in any category on any performance evaluation, but Nord/LB has alleged that in a review in 2000, Zakre acknowledged that the Bank viewed her performance as mediocre. Whether or not Nord/LB investigated Plaintiff's allegation of sex discrimination is in dispute.

After Nord/LB received the January 2002 Letter, Gajano began to increase Zakre's workload. Schmidt was hired by Nord/LB as vice president in the treasury department in March 2002. According to Zakre, Schmidt's experience was primarily with mortgage based products, and he did not have extensive knowledge of other financial products, particularly credit based products. Schmidt's responsibilities included establishing an alternative portfolio. Schmidt did not report to Zakre, and his profits were not included in the capital markets group, but Gajano required Zakre to insure that Schmidt's business proposal was prepared properly and to assist Schmidt in discussing his proposals with Nord/LB executives in New York and Germany. According to Nord/LB, Zakre lacks personal knowledge as to Schmidt's qualifications and experience.

In addition, prior to complaining of sex discrimination, Zakre had three full-time employees reporting to her and assisting her in the capital markets group, Spinelli, Carl Platt, and Wayne Babb. All three of these employees have left Nord/LB and none of their positions have been filled. Zakre now has no full-time employees reporting to her.

Gajano also required that Zakre establish repurchase lines with investment banks. This required spending a great deal of time with lawyers in Nord/LB's Head Office to complete the appropriate documentation. According to Zakre, this additional work which ordinarily would be a function of the money market desk, made it difficult for Plaintiff to complete her ongoing capital markets responsibilities. According to the Bank, her difficulties began before this assignment.

According to Zakre, Gajano also subjected her work to greater scrutiny after the Bank received the January 2002 Letter and consistently held meetings in which he berated her and her staff. According to Nord/LB Gajano's criticism commenced before the January 2002 Letter.

According to Zakre, Gajano also began to interfere with her client relationships. Gajano insisted that new account officers of his choosing be assigned to cover Nord/LB, and as a result, productive client relationships that Zakre took years to develop have been terminated, causing a decrease in business for the capital markets group, an allegation denied by Nord/LB.

According to Rudzwick, Zakre, and Spinelli, Gajano was nasty and abusive toward Zakre, and treated her worse than any other Nord/LB employees. Gajano yelled at Zakre frequently, including in front of

employees that reported to her, made mean and belittling comments to Zakre, and, according to Zakre and Spinelli, did not subject any male employees to this type of treatment. Nord/LB has denied these allegations and has noted testimony that Gajano's treatment is consistent with all employees.

Zakre complained to Liesenfeld verbally and in writing that Gajano was abusive to her staff, and especially to her in retaliation for her filing her complaint of sex discrimination. Whether or not Nord/LB investigated Zakre's complaints of retaliation is in dispute.

According to Zakre, in June 2002, Zakre complained to Liesenfeld about Gajano's inappropriate behavior toward her and her staff and after this meeting, human resources sent Zakre a memorandum stating that it would follow up on the meeting after Liesenfeld returned from vacation, but no action was ever taken. This allegation has been denied in part by Nord/LB stating that Westrick spoke to Gajano and Zakre about her complaint.

After her meeting with Liesenfeld in 2002, Zakre also received a memorandum, dated June 14, 2002 (the "Business Conduct Memo") regarding her alleged misconduct for one use of the word "bullshit." No one at Nord/LB discussed her conduct with her before sending her the Business Conduct Memo.

According to Rudzwick, Gajano engaged in much worse behavior and was never reprimanded. According to Spinelli, Gajano said "What the fuck," on a daily basis, in front of employees, as well as management, including Westrick and Liesenfeld, an allegation denied by Nord/LB. Gajano also made a gesture of simulating masturbation in front of Rudzwick and would often touch his genitals on the trading floor, an allegation denied by Nord/LB.

Gajano, however, was never reprimanded or punished for this conduct.

Other employees also routinely cursed on the trading floor, and were never reprimanded, but Nord/LB has noted the use of profanity was common on the trading floor. No one else at Nord/LB was ever given a letter reprimanding them for their business conduct. Moreover, the Business Conduct Memo alleged that Zakre yelled at Schmidt inappropriately. Schmidt, however, never complained about any behavior by Zakre.

The Business Conduct Memo was sent from Hollandt, but Hollandt did not write it. Upon her return from vacation, Hollandt was instructed by Westrick to sign the Business Conduct Memo and give it to Zakre.

In another incident, Zakre requested that Nord/LB verify her employment so that she could obtain a mortgage in 2003. Similar requests have been made by other Nord/LB employees. After her request, Zakre received a memorandum stating that although Nord/LB had supplied the requested information, that did not "prejudice Nord/LB's ability to terminate [Zakre's] employment in the future if it deems such action necessary due to a reorganization at Nord/LB or for any other reason." (Clark Aff., Ex. 10). Nord/LB has never sent a similar memorandum to any other employee.

Zakre was also initially excluded from a meeting that Westrick organized with Nord/LB's new chairman in 2004. According to Zakre, only after she noted that she was the only vice president excluded from the meeting was she invited; according to Nord/LB, Gajano added her name to the list.

According to Zakre, Gajano has taken steps to reduce the size of Zakre's portfolio and encouraged the growth of

Schmidt's business at the expense of Zakre's business by assigning a portion of the credit limits previously assigned to capital markets to Schmidt's group. Nord/LB has denied the allegation stating that Zakre lacks personal knowledge of Gajano's motives and Schmidt's actions.

Nord/LB has also recently instructed Zakre to sell her entire portfolio of CDOs which will reduce Zakre's responsibilities and reduce the income that she generates for Nord/LB. Gajano did not tell Zakre about the decision to sell the entire portfolio of CDOs until after he discussed the decision with Schmidt and Robert Fakhoury ("Fakhoury"), neither of whom had any responsibility for that portfolio.

According to Zakre, Gajano typically interacted with her as little as possible, constantly asked someone else, often his secretary, to communicate with her on his behalf, and when he did talk directly to Zakre, he does not look at her and does not treat other employees this way. Nord/LB has denied this allegation noting that Zakre has stated Gajano is abusive with all employees.

On February 11, 2005, Zakre received a memorandum from Stephen Hunter ("Hunter"), a senior vice president and deputy branch manager at Nord/LB, concerning an alleged outburst by Zakre and criticizing her for allegedly saying she was going to contact her lawyer. Whether Zakre did or did not have an outburst, and threatened to call her lawyer is in dispute.

The conversation referenced in the memorandum from Hollandt and about which Gajano had complained, was one in which Gajano told Zakre that Nord/LB had promoted Fakhoury to deputy treasurer, which would require Fakhoury to fill in for Gajano when Gajano was unavailable. Zakre had been performing those responsibilities since 1994. According to Nord/LB, Gajano replaced Zakre because of her performance.

According to Zakre, despite the obstacles that Gajano created for her, the capital markets group was very profitable in 2004, making over ten million dollars for Nord/LB without any full-time employees in capital markets for the last half of 2004, and the assistance of only one intern; in contrast, the alternative portfolio made less than five million dollars with the assistance of one full-time employee and the money market group made less than ten million dollars with the assistance of two full-time employees. Nord/LB has denied these allegations stating that Zakre lacks personal knowledge of Schmidt's performance.

Despite Zakre's performance, on February 18, 2005, Gajano informed Zakre that the Bank had hired Kevin Berger ("Berger") as head of debt capital markets, and that beginning March 14, 2005, Zakre would be reporting to Berger, who would report to Gajano. Nord/LB has denied the scope of Berger's appointment and has stated that Zakre remained head of capital markets.

Zakre has complained that her deputy responsibilities were taken away from her and that she was demoted in retaliation for filing her complaint of sex discrimination. Whether Nord/LB had investigated her claims of retaliation is in dispute.

In Nord/LB's New York office, Westrick, as the executive vice president, is the highest ranking employee. There are four senior vice presidents, none of whom are women. There are seven department heads in Nord/LB's New York office, none of whom currently are women.

### The Motion To Strike Is Denied

Nord/LB has moved to strike some or all of the affirmations of Zakre, Elchoueri, Brown, Rudzwick, and Spinelli

(the "Affirmations") as violative of the requirements of Fed.R.Civ.P. 56(e). However, the Affirmations are all based on personal knowledge and therefore are admissible. *See Shannon v. New York City Transit Authority,* 189 F.Supp.2d 55, 66–67 (S.D.N.Y.2002) (denying motion to strike affidavit based on personal knowledge). "The test for admissibility is whether a reasonable trier of fact could believe the witness had personal knowledge." *Searles v. First Fortis Life Ins. Co.,* 98 F.Supp.2d 456, 461 (S.D.N.Y.2000). An affiant may testify to conclusions based on her personal observations over time. *Id.* Similarly, witnesses may testify to and summarize their impressions. *See Kehoe v. Anheuser–Busch, Inc.,* 995 F.2d 117, 119 n. 3 (8th Cir.1993); *Griswold v. Fresenius USA, Inc.,* 978 F.Supp. 718, 722 (N.D.Ohio 1997); *see also Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 911 (2d Cir.1997) (affirming admission of testimony that witness believed that plaintiff was dismissed because of his age). An affiant may also testify as to the contents of records that she reviewed in her official capacity. *Searles,* 98 F.Supp.2d at 461.

The lack of certain specific details or arguably vague statements will not render the affidavit inadmissible, but affect the weight and credibility of the testimony, which have to be determined by the trier of fact at trial. *See King v. Auto, Truck, Indust. Parts and Supply, Inc.,* 21 F.Supp.2d 1370, 1375 (N.D.Fla.1998); *Crosfield Hastech, Inc. v. Harris Corp.,* 672 F.Supp. 580, 590 (D.N.H.1987).

The cases cited by the Bank in which affidavits, or portions thereof, were stricken or not admitted involved affiants who had no personal knowledge of the facts testified to or whom made conclusory statements.

As to Zakre's affirmation, Nord/LB has contended that her affirmation and deposition testimony are inconsistent. However, such inconsistency, if it exists, may affect her credibility, but it does not bar its admission.

Similarly, lack of supporting evidence does not affect admissibility. Zakre is competent to testify that Westrick avoided her and sought out a man's opinion rather than talk to her. *See Kehoe,* 995 F.2d at 119 n. 3 (allowing affiant to testify that his supervisor treated him "with disdain"); *State v. Saint Francis Hosp.,* 94 F.Supp.2d 423, 427 (S.D.N.Y.2000) (affiant may testify as to his perception of how parties interacted).[1]

Nord/LB has characterized Zakre's testimony as based on "surmise and conjecture" with respect to the client contacts. She has provided specific examples of clients she brought to Nord/LB and her summary of her experience is admissible.

As to Westrick's supervision of the treasury department, a reasonable jury could determine that Zakre had personal knowledge of whom her supervisor reported to and could conclude that as a senior member of the treasury department, she had personal knowledge concerning who was involved with salary and personnel decisions for the treasury department.

Zakre has worked for Gajano for over three and one-half years. It would be reasonable for a jury to conclude that her testimony is based on her personal knowledge of Gajano's skills. It would be reasonable for a jury to find also that Zakre, as a senior member of the treasury depart-

---

1. *Zenni v. Hard Rock Cafe Intern., Inc.,* 903 F.Supp. 644 (S.D.N.Y.1995), cited by Nord/LB is inapposite because it considered an affidavit that contained legal conclusions. *Id.* at 649 (affidavit contained statements that actions by employer were a "pretextual sham" that resulted in "age discrimination").

ment who was acting treasurer prior to Gajano's hiring, was aware of his performance issues even though she was not his direct supervisor. *See Shannon,* 189 F.Supp.2d at 66–67.

Nord/LB has challenged Zakre's testimony concerning knowledge of certain financial products because she did not supervise Schmidt. There is no requirement that only a supervisor can testify as to qualification and knowledge of a fellow employee.

Zakre's deposition testimony does not state that anyone told her there were performance issues in 1999 or that her job was in jeopardy. Therefore, Nord/LB's claim that there is an inconsistency between her deposition testimony and her affirmation should be dismissed.

As to Bier's affirmation, Nord/LB has moved to strike on grounds of lack of specificity and detail. However, it is appropriate for Bier to testify to information she learned from reviewing records as part of her job function. *See Searles,* 98 F.Supp.2d at 461 ("An affiant may testify as to the contents of records she reviewed in her official capacity."); *St. Francis Hosp.,* 94 F.Supp.2d at 426 (same). As to job performance, a reasonable jury may find that Bier's testimony is based on her personal knowledge gained over three years at the Bank, and therefore, there is no reason to strike this portion of her affirmation. *See Shannon,* 189 F.Supp.2d at 66–67; *Searles,* 98 F.Supp.2d at 461.

As to Elchoueri's affirmation, statements she heard Westrick make are admissible. The context in which they were made may be pursued at trial. Testimony based on her personal knowledge is admissible whether concerning qualifications or salary or statements made to her or in her presence.

Similar objections to the affirmations of Brown, Rudzwick, Srebnik, and Spinelli are equally unavailing.

Nord/LB has contended that certain paragraphs in Zakre's 56.1 Statement should be stricken because they do not specifically cite to admissible evidence. (Def. Mem. at 20). Where Zakre has not cited to admissible evidence, the statement contains a legal conclusion, or the jury would be entitled to disbelieve Defendant's evidence. In paragraph 17 for example, Zakre admitted the Bank's factual assertion that when Bovenizer replaced Zakre as treasurer, the Bank did not change Zakre's vice president title or decrease her salary, but appropriately denied Nord/LB's legal conclusion that its action was "significant."

In paragraph 32, Nord/LB asserted that Kosters was unimpressed with Zakre and therefore instructed Westrick to contact an executive search firm concerning a new treasurer and in paragraph 67, Zakre responded that the citation to Gajano's deposition referred to by Defendant did not support the factual assertion made by the Bank. Zakre's responses are appropriate because where the record does not support assertions made in a defendant's Rule 56.1 Statement, the unsupported assertions must be disregarded. *See Giannullo v. City of New York,* 322 F.3d 139, 140, 142–43 (2d Cir.2003).

In paragraph 34, Nord/LB relying on Kosters' deposition, asserted that Kosters told Westrick that he was looking for an individual who could elevate the treasury department to new levels. Zakre responded that a jury would not be required to believe the testimony of Kosters because he is an interested witness. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). For the same reason, Zakre also stated that a jury would not be re-

quired to believe Kosters' testimony concerning why he choose to hire Gajano (paragraph 48) and why he choose not to hire Plaintiff (paragraph 53). In paragraph 36, Zakre appropriately responded that a jury would not be required to believe Westrick's testimony concerning his instructions to the search firm used to fill the treasurer position because Westrick is also an interested witness.

As a general matter, Nord/LB/s objections to Zakre's evidence goes to weight and credibility, not admissibility. The motion to strike is therefore denied.

### The Summary Judgment Standard

Pursuant to Rule 56, summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *SCS Communications, Inc. v. Herrick Co., Inc.,* 360 F.3d 329, 338 (2d Cir.2004). The court will not try issues of fact on a motion for summary judgment, but rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Services, Ltd. P'ship,* 22 F.3d 1219, 1223–24 (2d Cir.1994) (internal citations omitted). If, however, " 'as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.' " *Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.,* 391 F.3d 77, 83 (2d Cir.2004) (quoting *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir.1996)).

The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Bickhardt v. Ratner,* 871 F.Supp. 613 (S.D.N.Y.1994) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, "summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir. 1993).

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997).

"The salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation." *Nicastro v. Runyon,* 60 F.Supp.2d 181, 183 (S.D.N.Y.1999) (citing *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988)). Greater caution must be exercised, however, in granting summary judgment in employ-

ment discrimination cases where the employer's intent is genuinely in issue. *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir. 1999). This is so because "employers are rarely so cooperative as to include a notation in the personnel file that the [action complained of] is for a reason expressly forbidden by law." *Bickerstaff v. Vassar College,* 196 F.3d 435, 448 (internal quotation marks and citation omitted; brackets in the original). But even where an employer's intent is at issue, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997); *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985).

### There Are Disputed Facts Relating To The Denial Of Promotion Claim

Under the framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff asserting a claim of discrimination must first establish a *prima facie* case. To establish a *prima facie* case, a plaintiff must point to record evidence showing that: (1) she is a member of a protected class; (2) she applied for and was qualified for a job for which the employer was seeking applicants; (3) despite her qualifications, she was rejected; and (4) her rejection occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in that protected class. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817; *Rosen v. Thornburgh,* 928 F.2d 528, 531 (2d Cir.1991); *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir.1985), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).

If that *prima facie* case is established, the burden of production, but not persuasion, shifts to the employer to set forth a legitimate non-discriminatory reason for the non-selection. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Once the employer has met its burden of showing a legitimate, non-discriminatory reason for the employment action, the employee must then show that the reason advanced is pretextual—*i.e.,* that it masks the employer's true discriminatory reason for its actions. *See Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ The "showing the plaintiff must make as to the elements of the *prima facie* case in order to defeat a motion for summary judgment is *de minimis.*" *Sutera v. Schering Corp.,* 73 F.3d 13, 16 (2d Cir. 1995) (internal quotation and citation omitted). Defendant challenges only one aspect of Plaintiff's *prima facie* case, arguing that she cannot show she was qualified for the position of treasurer. (Def.Br.11).

■ To meet the qualification prong of a *prima facie* case of failure to promote, Zakre need only demonstrate that she possessed the abilities, education, training, or experience necessary to perform the job. *See, e.g., de la Cruz v. New York City Human Resources Admin.,* 82 F.3d 16, 20 (2d Cir.1996). Beyond Zakre's experience and qualifications acknowledged by her colleagues (Pl. 56.1 ¶¶ 6–7, 89–91, 132), Zakre held the position of treasurer prior to Westrick's arrival at the Bank and was acting treasurer while the Bank sought Bovenizer's replacement. (Pl. 56.1 ¶¶ 90–91, 109–12). These facts establish that she met the basic qualifications for the job.

While the record thus far does not establish a discriminatory motive on Kosters' decision not to promote Zakre, it is her position that Westrick was the decisionmaker and that the record establishes a factual issue as to his discriminatory intent.

According to Zakre, Kosters told Spinelli that it was not he, Kosters, who made the decision to hire Gajano, but Westrick (Pl. 56.1 ¶ 139) and there is evidence that after Kosters told Zakre that she would be considered for the treasurer position, he asked Westrick to narrow the candidates down to three, (Pl. 56.1 ¶ 39) that Westrick selected the three candidates for Kosters to consider in a memorandum that catalogs several factors upon which it would be illegal to make the selection. (Pl. 56.1 ¶ 40). After Westrick learned that Gajano had been abusive to Srebnik at Napoli, Westrick told Elchoueri that he was recommending that Kosters select Gajano.

■ Where successive evaluators consider and rely on the report or recommendation of prior biased evaluators, the factfinder may infer that discrimination has infected the entire process. *Price Waterhouse v. Hopkins,* 490 U.S. 228, 256, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Feingold v. New York,* 366 F.3d 138, 146–47 (2d Cir.2004); *Ostrowski v. Atl. Mut. Ins. Cos.,* 968 F.2d 171, 183–84 (2d Cir.1992); *Barbano v. Madison County,* 922 F.2d 139, 144 (2d Cir.1990); *Lam v. University of Hawaii,* 40 F.3d 1551, 1560–61 (9th Cir.1994); *Roebuck v. Drexel Univ.,* 852 F.2d 715, 727 (3d Cir.1988).

According to Zakre, Westrick on several occasions made comments evidencing bias against women. Given that these comments were made by a key employee involved in the promotion decision, they cannot be dismissed as mere "stray remarks." *See Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 56 (2d Cir.1998). Moreover, recent Supreme Court decisions and circuit court decisions have recognized that most comments potentially reflecting bias have evidentiary value. *See Reeves,* 530 U.S. at 152, 120 S.Ct. 2097; *Evans v. City of Bishop,* 238 F.3d 586, 591 (5th Cir.2000) (per curium) ("*Reeves* emphatically states that requiring evidence of discriminatory animus to be 'in the direct context' of the employment decision is incorrect."); *accord Russell v. McKinney Hosp. Venture,* 235 F.3d 219, 229 (5th Cir.2000) ("In light of the Supreme Court's admonition in *Reeves,* our pre-*Reeves* jurisprudence regarding so-called 'stray remarks' must be viewed cautiously."). Courts have held that although such comments may not be dispositive, they are still relevant and probative. *See, e.g., Sheehan v. Donlen Corp.,* 173 F.3d 1039, 1044 (7th Cir.1999) (recognizing that comments stereotyping pregnant women had probative value even where they did not rebut proffered reason of poor interpersonal skills).

Women who worked at Nord/LB also testified that Westrick was responsible for women being paid less than comparable men and for excluding them from meetings, reacted negatively to assertive women, and otherwise ignored women, preferring to speak to male employees about any issues that arose. A jury could find that the exclusionary culture fostered by Westrick evidenced a biased attitude toward women. *See Doria v. Cramer Rosenthal McGlynn, Inc.,* 942 F.Supp. 937, 946 (S.D.N.Y.1996).

Nord/LB's selection of Gajano after Srebnik notified it that Gajano had treated her abusively and discriminated against her at Banco di Napoli also can constitute an inference of bias against women. Kosters acknowledged that Srebnik made her complaints before a decision was made to hire Gajano, but testified that the information supplied by Srebnik was no reason not to hire Gajano. (Pl. 56.1 ¶¶ 134–36). Elchoueri, who worked closely with Westrick, was sure that Westrick would select Gajano because of Srebnik's complaint, a statement with which Liesenfeld, an officer of the Bank, and Hollandt tacitly agreed. (Pl. 56.1 ¶ 137). *See Penguin Books U.S.*

*A., Inc. v. New Christian Church of Full Endeavor, Ltd.,* 262 F.Supp.2d 251, 259–60 (S.D.N.Y.2003) (silence may constitute admission and any ambiguities are for the jury to decide).

■ Once a plaintiff has shown disputed facts as to the *prima facie* case, "the employer must come forward with admissible evidence of legitimate nondiscriminatory reasons for its adverse actions." *Mandell,* 316 F.3d at 380. Once the defendant produces evidence of a legitimate nondiscriminatory reason, "the presumption raised by the prima facie case is rebutted, and drops from the case." *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742. At that point, the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred. *James v. New York Racing Ass'n,* 233 F.3d 149, 156 (2d Cir.2000). Here, Zakre has shown that a reasonable jury could find that the defendants' proffered reasons are a pretext for discrimination.

Evidence has been presented that those who worked closely with Zakre considered her to be well qualified to succeed Bovenizer, that Bovenizer told Zakre that he was recommending to Kosters that she become treasurer and that Kosters told Zakre that she would be considered for the position. According to Zakre, when Gajano was selected, Kosters first told Zakre the reason was that Gajano had more trading experience; when Zakre said that was not true, Kosters then said it was because Gajano had more client contact, which was also false. At their depositions, Kosters and Westrick provided yet other explanations.

These contradictions, without more, would permit a finding that Zakre has established pretext. *See Reeves,* 530 U.S. at 147, 120 S.Ct. 2097; *E.E.O.C. v. Ethan Allen, Inc.,* 44 F.3d 116, 120 (2d Cir.1994).

■ A plaintiff can establish that the adverse action occurred in circumstances suggesting bias by showing that she was not considered for a job for which she arguably was qualified. *See Stratton v. Dep't for the Aging,* 132 F.3d 869, 880 (2d Cir.1997); *Greene v. Coach, Inc.,* 218 F.Supp.2d 404, 411 (S.D.N.Y.2002). Here, Zakre has asserted that Bovenizer, who supervised Zakre, told her that he was recommending that she replace him, and Rudzwick and Spinelli both testified that Zakre was fully qualified to be treasurer. Before Westrick arrived and demoted Zakre, she was treasurer, and she was appointed acting treasurer after Bovenizer left.

■ There is an issue of fact as to whether or not Zakre had stronger qualifications for the treasurer position than did Gajano. The Second Circuit has found in cases such as this that "an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of an employer's stated justification for an employment decision," suggesting pretext. *Byrnie v. Town of Cromwell,* 243 F.3d 93, 103 (2d Cir.2001); *Shannon v. Fireman's Fund Ins. Co.,* 156 F.Supp.2d 279, 290 (S.D.N.Y.2001).[2]

Sufficient factual issues have been presented concerning Zakre's denial of promotion claim to defeat summary judgment.

2. Nord/LB claims that in order to establish pretext, plaintiff must "prove that her qualifications are 'so superior' to ... Gajano's credentials that 'no reasonable person, in the exercise of impartial judgment,' could have chosen ... Gajano over ... Zakre for the position." (Def.Br.14). The standard is so high only when superior qualifications is a plaintiff's sole means of proving pretext, *see Byrnie,* 243 F.3d at 103, which is not the situation in Zakre's case.

### There Are Disputed Facts Relating To The Claims Of Retaliation

■ In contending that Zakre did not experience any adverse employment action for the purposes of her retaliation claim (Def.Br.21–22), Nord/LB failed to note that Zakre was replaced as deputy treasurer, that she contends that her role as head of capital markets has been diminished, and that she has been moved down the corporate hierarchy. A demotion is an adverse employment action. *Mandell*, 316 F.3d at 383.

Zakre also has pointed out that in determining whether she has suffered an adverse employment action, all of the actions taken against her must be considered, *see Timothy v. Our Lady of Mercy Med. Ctr.*, No. 03 Civ. 3556(RCC), 2004 WL 503760, at *6–7 (S.D.N.Y. March 12, 2004) (and cases cited), keeping in mind that, "[t]he phrase terms, conditions, or privileges of employment evinces a congressional intent to strike at the entire spectrum of disparate treatment ... in employment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (citations omitted); *see Burlington Indus. v. Ellerth*, 524 U.S. 742, 759, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("a tangible employment action constitutes a significant change in employment status, such as ... reassignment with significantly different responsibilities ....") (citing *Crady v. Liberty Natl. Bank & Trust Co. of Ind.*, 993 F.2d 132, 136 (7th Cir.1993)) (material change includes "a less distinguished title ... significantly diminished material responsibilities, or other indices that might be unique to a particular situation."). The Second Circuit reaffirmed this standard in *Richardson v. New York State Dep't of Corr. Service*, 180 F.3d 426, 446 (2d Cir. 1999):

Title VII does not define adverse employment action solely in terms of job termination or reduced wages and benefits, and ... less flagrant reprisals by employers may indeed be adverse.... [B]ecause there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of adverse.

(internal quotations and citations omitted); *see also Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir.2002) (actions are adverse when they constitute a "materially adverse change in the terms, privileges, duration [or] conditions of employment").

Certain of the specific actions that Zakre maintains have been taken against her have been held to constitute adverse employment actions. *See Feingold*, 366 F.3d at 152–53 (disproportionately heavy workload is adverse employment action); *Preda v. Nissho Iwai American Corp.*, 128 F.3d 789, 791 (2d Cir.1997) (exclusion from departmental meetings evidence of adverse employment action); *Dominic v. Consol. Edison Co.*, 822 F.2d 1249, 1254–55 (2d Cir.1987) ("bringing [plaintiff] within [supervisor's] direct and heavy-handed supervision and then subjecting him to unreasonable working conditions"); *AB ex rel. CD v. Rhinebeck Cent. Sch. Dist.*, 224 F.R.D. 144, 154 (S.D.N.Y.2004) (threats of unjustified discipline); *Chavez v. Metropolitan Dist. Comm'n*, No. 3:02 Civ. 458(MRK), 2004 WL 1393616, at *4 (D.Conn. June 1, 2004) (reassignment of plaintiff's job duties to other employees, overriding his decisions, and exclusion of plaintiff from meetings); *Dortz v. City of New York*, 904 F.Supp. 127, 156 (S.D.N.Y. 1995) (isolation of plaintiff by refusing to communicate with her, excluding her from meetings, and assigning work to her staff without informing her); *see also Luciano*, 110 F.3d at 215 (evidence of discrimination that plaintiff was intentionally given an impossible workload without the commensurate support staff).

Zakre has claimed that a hostile work environment existed at Nord/LB either because of Plaintiff's gender or because of her complaints of sex discrimination, or a combination of the two. *See Terry v. Ashcroft,* 336 F.3d 128, 148–50 (2d Cir.2003); *Raniola v. Bratton,* 243 F.3d 610, 617 (2d Cir.2001); *Noviello v. City of Boston,* 398 F.3d 76, 89–90 (1st Cir.2005) (collecting cases).

 There is no "magic number" of incidents a plaintiff must allege in order to state a claim. *Richardson,* 180 F.3d at 439. "[T]he test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Feingold,* 366 F.3d at 150 (internal quotation marks and citations omitted). Zakre and other witnesses testified that since Gajano was hired, and even more so after she complained of discrimination, Gajano was frequently nasty and abusive to her; increased her work load while decreasing her staff; often demeaned her in front of colleagues and subordinates; made unjustified criticism of her and sought to blame her for matters not her fault; took away responsibilities; and demoted her, first by removing her as deputy treasurer and then by hiring a man to head capital markets and requiring Plaintiff to report to him. In addition, Nord/LB has taken disciplinary action against Zakre, issuing her baseless warning memoranda and making other threats to terminate her employment. Based upon this evidence, a reasonable jury could find that this conduct has altered her work environment for the worse.

To establish her claim, Zakre need not prove any sexually based conduct; rather the issue is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."

*Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (citations omitted). This, the contention that Gajano was more abusive to women than to men (Pl. 56.1 ¶¶ 219, 229) may be enough to meet this element. *See Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264, 269–70 (8th Cir.1993); *see also Brown,* 257 F.3d at 252–54.

In addition, allegations of Gajano's bias against women, including his similar treatment of Srebnik at Banco di Napoli, his assumptions that Srebnik would not return from maternity leave, and his statements that he would not hire a woman to replace Srebnik, present issues of fact as to whether Gajano's treatment of Zakre was motivated by her gender. The allegation that Nord/LB has disciplined Zakre for conduct for which no men are disciplined, while refusing to discipline Gajano for far worse conduct, are also issues of fact relating to bias. *See Feingold,* 366 F.3d at 153.

According to Zakre, Gajano's abusive conduct toward her intensified after she complained of discrimination, to the point that he treated her, and to some extent the women on her staff viewed as loyal to her, far worse than any other employee.

According to Zakre, her complaints of discrimination and retaliation were met with hostility and indifference, as to which factual disputes exist. Nord/LB has admitted that it handled Zakre's request for information for a mortgage differently from requests from any other employee. When Zakre complained that her removal as deputy treasurer was retaliatory, she was given a memorandum for having done so, that specifically chastises her for saying she was going to call her attorney; while Zakre has denied making the statement. Kosters rebuked Spinelli for complaining about Gajano, and Gajano criticized Srebnik for complaining about him.

512

There are sufficient facts at issue to deny Nord/LB's motion for summary judgment dismissing the discrimination and retaliation claims. *Cf. Terry,* 336 F.3d at 150 (discriminatory attitudes could have exacerbated the effects of retaliation-based hostility and vice versa).

The burden of proof is on Nord/LB to establish both prongs of an affirmative defense, that is, to show that "it exercised reasonable care to prevent and correct promptly any" harassing behavior, and that plaintiff "unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth,* 524 U.S. at 765, 118 S.Ct. 2257; *Faragher,* 524 U.S. at 807, 118 S.Ct. 2275 ("The defense comprises two necessary elements"). Zakre has complained that she has been mistreated because of her gender and because of her complaints of discrimination. Nord/LB has failed to establish that no issue of fact exists as to whether or not Nord/LB has investigated any of her complaints or taken any steps to correct and prevent the hostile working conditions.

For the foregoing reasons, Defendant's motion for summary judgment is denied.

### Conclusion

The motions of Nord/LB to dismiss the complaint and to strike are denied.

It is so ordered.